34 F.3d 1173
 29 Fed.R.Serv.3d 496
 Sidney LUNDY; Claire Lundy, Appellants,
v.
ADAMAR OF NEW JERSEY, INC., t/a Trop World, Defendant/Third
Party Plaintiff,
v.
Dr. Domenic Frank CARLINO, individually; Dr. Domenic Frank
Carlino, a Professional Association, Third-Party Defendants.
 No. 93-5265.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 1, 1993.
Decided July 6, 1994.
Sur Petition for Rehearing Aug. 12, 1994.
 
 Andrew F. Napoli (Argued), Norman R. Segal, Manchel, Lundy & Lessin, Philadelphia, PA, for appellants.
 Stephen Hankin (Argued), Thomas F. Bradley, Hankin, Sandson & Sandman, Atlantic City, NJ, for appellee Adamar of New Jersey d/b/a TropWorld Casino and Entertainment Resort.
 James P. Savio (Argued), Savio, Reynolds & Drake, Absecon, NJ, for appellees-third-party defendants, Dr. Dominic Frank Carlino and Dr. Dominic Frank Carlino, a Professional Ass'n.
 BEFORE: BECKER and STAPLETON, Circuit Judges, and RESTANI,* Judge, United States Court of International Trade.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 Appellant Sidney Lundy suffered a heart attack while a patron at appellee's casino, TropWorld Casino ("TropWorld"), in Atlantic City, New Jersey. While he survived, Lundy was left with permanent disabilities. Lundy and his wife here appeal from a summary judgment entered against them by the district court. Their appeal raises two issues: (1) what duty, if any, did TropWorld owe under New Jersey law to provide medical care to Lundy, and (2) whether the Lundys were entitled to amend their complaint to include an additional defendant, Dr. Dominic Carlino.[1]
 
 
 2
 The district court held that TropWorld's duty is, at most, to provide basic first aid to the patron when the need becomes apparent and to take reasonable steps to procure appropriate medical care. Because the court found no evidence that TropWorld was negligent in carrying out this duty to Lundy, it granted TropWorld's motion for summary judgment. With regard to the Lundys' motion to amend, the court found that the amendment would not relate back to the time of the filing of the complaint under Rule 15(c) and, accordingly, that the alleged claim against Dr. Carlino would be barred by limitations. We will affirm.
 
 I. FACTUAL BACKGROUND
 
 3
 On August 3, 1989, Lundy, a 66 year old man with a history of coronary artery disease, was patronizing TropWorld Casino. While Lundy was gambling at a blackjack table, he suffered cardiac arrest and fell to the ground unconscious. Three other patrons quickly ran to Lundy and began to assist him. The first to reach him was Essie Greenberg ("Ms. Greenberg"), a critical care nurse. Ms. Greenberg was soon joined by her husband, Dr. Martin Greenberg ("Dr. Greenberg"), who is a pulmonary specialist. The third individual who aided Lundy did not disclose his identity, but he indicated to Dr. Greenberg that he was a surgeon. During his deposition, Dr. Greenberg stated that, when he first arrived on the scene, Lundy was unresponsive, not breathing, and without a pulse. Dr. Greenberg testified that he, his wife, and the surgeon immediately began to perform cardiopulmonary resuscitation ("CPR") on Lundy.
 
 
 4
 Meanwhile, the blackjack dealer at the table where Lundy had been gambling pushed an emergency "call" button at his table which alerted TropWorld's Security Command Post that a problem existed. The Security Command Post is electronically designed to designate the location from which such alarms are triggered and record the time that the alarm is sounded. The alarm was recorded as being received at 10:57 p.m. Noting that the source of the alarm was "Pit 3," a Security Command Post employee notified by phone the security post located on the casino floor near where Lundy had suffered his cardiac arrest. At 10:59 p.m., the Security Command Post employee sent radio directions to all of the guards on the casino floor requesting that they each go to Lundy's location.
 
 
 5
 A sergeant in TropWorld's security force and a TropWorld security guard arrived at the blackjack table apparently within fifteen seconds of their receiving the radio message from the Security Command Post. The Greenbergs and the unidentified surgeon were already assisting Lundy. Upon arriving, the security guard called the Security Command Post on her hand-held radio and requested that someone contact the casino medical station, which was located one floor above the casino. Several witnesses agree that Nurse Margaret Slusher ("Nurse Slusher"), the nurse who was on-duty at the casino medical station at the time, arrived on the scene within a minute or two of being summoned. As soon as Nurse Slusher arrived, she instructed the security guards to call for an ambulance. TropWorld's records indicate that an ambulance was summoned at 11:00 p.m.
 
 
 6
 Nurse Slusher brought with her an ambu-bag,[2] oxygen, and an airway.[3] She did not, however, bring an intubation kit[4] to the scene. Dr. Greenberg testified that he asked Nurse Slusher for one and she told him that it was TropWorld's "policy" not to have an intubation kit on the premises. Dr. Greenberg also noted that Nurse Slusher told him that she previously worked at a different casino which did have an intubation kit in its medical station, and that she had requested one here as well. Nurse Slusher testified at her deposition that some of the equipment normally found in an intubation kit was stocked in TropWorld's medical center,[5] but that she did not bring this equipment with her because she was not qualified to use it.
 
 
 7
 Nurse Slusher proceeded to assist the three patrons in performing CPR on Lundy. Specifically, Nurse Slusher placed the ambu-bag over Lundy's face while the others took turns doing chest compressions. The ambu-bag was connected to an oxygen source. Dr. Greenberg testified that he was sure that air was entering Lundy's respiratory system and that Lundy was being adequately oxygenated during the period when he was receiving both CPR treatment and air through the ambu-bag. Dr. Greenberg went on to say that the only reason he had requested an intubation kit was "[t]o establish an airway and subsequently provide oxygen in a more efficient manner." App. 228.
 
 
 8
 The TropWorld Security Command Post radio log reflects that an Emergency Medical Technician ("EMT") unit arrived at TropWorld by ambulance at approximately 11:03 p.m. The EMT's report lists 11:02 p.m. as the time of arrival. Based on the fact that he performed CPR "for what seemed like an extensive amount of time," Dr. Greenberg estimated that "at least twenty minutes" elapsed between the time Lundy suffered cardiac arrest and the time the EMT unit arrived at Pit 3. App. 220.
 
 
 9
 Upon the arrival of the EMT unit, a technician, with the help of the two doctor patrons, attempted to intubate Lundy using an intubation kit brought by the EMT unit. Dr. Greenberg claimed that, due to Lundy's stout physique and rigid muscle tone, it was a very difficult intubation, and that there were at least a half dozen failed attempts before the procedure was successfully completed. After intubation, Lundy regained a pulse and his color improved. According to EMT reports, the ambulance departed from TropWorld with Lundy at 11:27 p.m., and it arrived at the Atlantic City Medical Center, which is located less than one mile from TropWorld, at 11:29 p.m.
 
 
 10
 The Lundys filed this diversity action against TropWorld less than two weeks before the applicable statute of limitations expired on August 3, 1991.[6] TropWorld filed an answer to the Lundys' complaint on September 12, 1991, along with a third-party complaint against a Dr. Carlino. TropWorld alleged that, in the event it were held liable to the Lundys, it would be entitled to either contribution or indemnification from Dr. Carlino.
 
 
 11
 TropWorld had a contract with Dr. Carlino providing that he would run an in-house medical station to supply medical services for TropWorld's employees, guests, and patrons in cases of work-related injuries and injuries or sicknesses occurring on the premises. The contract required that Dr. Carlino provide a licensed physician on the casino premises for five hours each day, and a physician "on-call" for the rest of the day. Any physician selected by Dr. Carlino was subject to dismissal by TropWorld for good cause only. Furthermore, Dr. Carlino was obligated to have a registered nurse present in the medical station during the hours that the casino was open. Each nurse was to be chosen by Dr. Carlino, but was subject to dismissal by TropWorld for any reason whatsoever. The contract specifically stated that Dr. Carlino's status would be that of an independent contractor and the doctors and nurses at the station were to be employees of Dr. Carlino. In August of 1989, Nurse Slusher was a registered, licensed nurse with over fifteen years of experience.
 
 
 12
 Dr. Carlino's contract with TropWorld required him to stock the medical station with certain designated medical hardware, including a Puritan-Bennett Manual Resuscitator (i.e. an ambu-bag with oxygen), intravenous solutions for cardiopulmonary resuscitation, a cardiac board, an oxygen cylinder with nasal canula and mask, and a laryngoscope with intubation tube.[7] The contract, which was signed on December 11, 1987, required that medical services be performed for a period of two years in exchange for a flat fee from TropWorld.
 
 
 13
 According to the Lundys, they did not know that Nurse Slusher was employed by an organization other than TropWorld until TropWorld filed its third party complaint against Dr. Carlino on September 11, 1991. By this time, however, the two-year statute of limitations had expired. Eight months later, the Lundys filed a motion under Fed.R.Civ.P. 15(c) to amend their original complaint to add third party defendant Dr. Carlino as an original party defendant. This motion was granted by a magistrate judge on July 8, 1992.
 
 
 14
 Upon the completion of discovery, TropWorld filed a motion for summary judgment which was joined by Dr. Carlino. Dr. Carlino also filed an appeal from the order of the magistrate judge granting the Lundys' Rule 15(c) motion. The district court granted the motion for summary judgment and reversed the magistrate's order granting the Rule 15(c) motion.
 
 II. THE DISTRICT COURT'S DECISION
 
 15
 The district court held that TropWorld had fulfilled its duty to Lundy under New Jersey law. The court found that TropWorld had "immediately summoned medical attention for Mr. Lundy once it became aware of his need for it." App. 651-52. Additionally, the court stated that "the very fact that TropWorld contracted with Dr. Carlino is evidence that it fulfilled its duty to aid injured patrons by having at least a registered nurse available, trained in emergency care, who could immediately size up a patron's medical situation and summon appropriate emergency medical personnel and equipment by ambulance to respond to the patrons's (sic) emergency needs." App. 652. The court also found that the Lundys' case failed for "lack of proof of deviation from the standard of medical care."[8] App. 655.
 
 
 16
 Additionally, the court held that New Jersey's Good Samaritan Statute, N.J.Stat.Ann. Sec. 2A:62A-1 (West 1993), shielded TropWorld and its employees from liability for any acts or omissions they took while rendering care in good faith to Lundy. Finally, the court held that the casino could not be held liable for any of Nurse Slusher's actions because she was an employee of independent contractor Dr. Carlino, rather than an employee of TropWorld.
 
 
 17
 Turning to the Lundys' Rule 15 motion to add Dr. Carlino as a party defendant, the district court found that neither the version of Rule 15(c) in effect at the time of the filing of the Lundys' motion nor the subsequently amended version of that Rule permits a plaintiff, after the running of the statute of limitations, to add an entirely new defendant of whom the plaintiff had been unaware during the limitations period. The court stated that Rule 15(c) "applies only to problems of misnomer and misidentification and not the addition of an entirely different party." App. 632. Furthermore, the court held that, even if Rule 15(c) were interpreted as permitting the addition of previously unidentified parties, the Lundys' amended complaint did not relate back to their original complaint because Dr. Carlino did not receive notice of a claim by the Lundys against him within the 120-day period as required by subsection (3) of the Rule.
 
 
 18
 Our review of the district court's decision to grant summary judgment is plenary. Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128, 129 (3d Cir.1991). Because the district court's decision regarding the Rule 15(c) motion was based on the court's interpretation of the Federal Rules of Civil Procedure, we exercise plenary review of this decision as well. International Union, UAW v. Mack Trucks, Inc., 917 F.2d 107, 110 (3d Cir.1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).[9]III. TROPWORLD'S MOTION FOR SUMMARY JUDGMENT
 
 
 19
 The Federal Rules of Civil Procedure state that a court may grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is subject to judgment as a matter of law. Fed.R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" when it "might affect the outcome of the suit under the governing law." Id. Disputes over facts which are irrelevant or unnecessary will not preclude a grant of summary judgment. Id.
 
 
 20
 The initial burdens of informing the court of the basis for a motion for summary judgment and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact fall on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the moving party can satisfy these initial burdens, Rule 56(e) states that the nonmoving party "may not rest upon the mere allegations or denials of his [or her] pleadings, but his [or her] response ... must set forth specific facts showing that there is a genuine issue for trial." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir.) (citing Fed.R.Civ.P. 56(e)), cert. denied, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985). However, any reasonable inferences that can be drawn from the record must be viewed in the light most favorable to the party opposing the motion. Sorba v. Pennsylvania Drilling Co., Inc., 821 F.2d 200, 202-03 (3d Cir.1987), cert. denied, 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988). It is with this standard in mind that we review the district court's decision to grant TropWorld's motion for summary judgment.
 
 
 21
 The Lundys cannot, and do not, claim that TropWorld was responsible in any way for Mr. Lundy's medical emergency. Nor do they claim that TropWorld breached a duty to procure competent aid from the outside with reasonable expedition. Rather, as we understand it, the Lundys advance two theories of liability against TropWorld. First, the relationship between a casino and its patrons gives rise to a duty to provide medical care, and TropWorld breached this duty when it failed to have on-site the equipment and skilled personnel necessary to perform an intubation. Second, TropWorld breached a voluntarily assumed duty by failing to provide Dr. Greenberg, upon his request, with the laryngoscope with intubation tube that was available in the medical station. We will address each theory in turn. Because there are no New Jersey Supreme Court cases which clearly delineate the duties owed by casino ownership to patrons suffering medical emergencies, we must predict how that court would rule on this question. Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1366 (3d Cir.1993).
 
 A.
 
 22
 Generally, a bystander has no duty to provide affirmative aid to an injured person, even if the bystander has the ability to help. See W. Page Keeton et al., Prosser and Keeton on the Law of Torts Sec. 56, at 375 (5th ed. 1984). New Jersey courts have recognized, however, that the existence of a relationship between the victim and one in a position to render aid may create a duty to render assistance. See, e.g., Praet v. Borough of Sayreville, 218 N.J.Super. 218, 527 A.2d 486, 489 (App.Div.1987). In Szabo v. Pennsylvania R.R. Co., 132 N.J.L. 331, 40 A.2d 562 (Err. & App.1945), for example, New Jersey's highest court held that, in the absence of a contract or statute, an employer generally has no duty to provide medical service to treat an ill or injured employee, even if the illness or injury was the result of the employer's negligence. However, if the employee, while engaged in the work of his or her employer, sustains an injury rendering him or her helpless to provide for his or her own care, the employer must secure medical care for the employee. Id., 40 A.2d at 563. If a casino owner in New Jersey owes no greater duty to its patrons than an employer owes its employees while they are engaged in the employer's business, we think it clear that TropWorld did not fail in its duty to render assistance.
 
 
 23
 The Lundys insist, however, that TropWorld had a duty beyond that recognized in Szabo. They urge specifically that the Supreme Court of New Jersey would adopt the rule set forth in the Restatement (Second) of Torts Sec. 314A (1965). Section 314A states in pertinent part:
 
 
 24
 (1) A common carrier is under a duty to its passengers to take reasonable action
 
 
 25
 (a) to protect them against unreasonable risk of physical harm, and
 
 
 26
 (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
 
 
 27
 (2) An innkeeper is under a similar duty to its guests.
 
 
 28
 (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
 
 
 29
 We think it likely that the Supreme Court of New Jersey would accept the principles enunciated in Sec. 314A and would apply them in a case involving a casino and one of its patrons. We need not so hold, however. The pertinent commentary following Sec. 314A indicates that the duty "to take reasonable action ... to give ... first aid" in times of emergency requires only that carriers, innkeepers and landowners procure appropriate medical care as soon as the need for such care becomes apparent and provide such first aid prior to the arrival of qualified assistance as the carrier's, innkeeper's or landowner's employees are reasonably capable of giving. Clearly, the duty recognized in Sec. 314A does not extend to providing all medical care that the carrier or innkeeper could reasonably foresee might be needed by a patron. Specifically, the commentary states:
 
 
 30
 f. The defendant ... [i]n the case of an ill or injured person ... will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained.
 
 
 31
 Nurse Slusher was a registered, licensed nurse who had been trained in emergency care and who had fifteen years of nursing experience. The uncontradicted evidence was that, despite this training and experience, she was not competent to perform an intubation. It necessarily follows that the duty which the Lundys insist the New Jersey Supreme Court would recognize in this case would require casinos to provide a full-time on-site staff physician. Certainly, maintaining on a full-time basis the capability of performing an intubation goes far beyond any "first aid" contemplated by Sec. 314A. We are confident the New Jersey Supreme Court would decline to impose liability on TropWorld for failing to maintain that full-time capability.
 
 B.
 
 32
 The Lundys further claim that, even if there would otherwise be no duty to provide a level of care encompassing intubation, TropWorld voluntarily assumed a duty to provide such care and breached that duty by negligently failing to provide it. As we understand the argument, TropWorld voluntarily assumed this duty in two ways. First, by contracting with Dr. Carlino to have a laryngoscope with intubation tube on the premises, TropWorld voluntarily assumed the duty of having it available for use on request. Second, by voluntarily undertaking to assist Mr. Lundy, TropWorld assumed a duty to use due care in providing that assistance and breached this duty when Nurse Slusher failed to bring the laryngoscope with intubation tube to Dr. Greenberg. In connection with this second argument, the Lundys rely upon the principles outlined in Sec. 324 of the Restatement (Second) of Torts which provides:
 
 
 33
 One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by
 
 
 34
 (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
 
 
 35
 (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.
 
 
 36
 As we have indicated, TropWorld's medical center, as a result of its contract with Dr. Carlino, did have a laryngoscope with intubation tube as part of its inventory of equipment. Nurse Slusher did not bring this equipment with her when she was summoned to Pit 3, however. She brought only that equipment that she was qualified to use: the ambu-bag, oxygen, and an airway. At some point after her arrival on the scene, Dr. Greenberg asked for an intubation kit. While the Lundys do not expressly so state, we understand their contention to be that Nurse Slusher should have returned to the medical center at this point and retrieved the intubation tube for Dr. Greenberg's use and TropWorld is liable for her failure to do so. They suggest that her failure to do so was the result of an ill-considered TropWorld policy that she was not permitted to use intubation equipment.
 
 
 37
 We reject the notion that TropWorld, by contracting with Dr. Carlino, voluntarily assumed a duty to Mr. Lundy it would not otherwise have had. The Lundys have referred us to no New Jersey case law supporting this proposition and we have found none.
 
 
 38
 The Lundys' argument based on Sec. 324 of the Restatement, ignores the fact that the principles restated therein have been materially altered by New Jersey's Good Samaritan Act, Sec. 2A:62A-1 N.J.Stat.Ann. That Act provides that anyone "who in good faith renders emergency aid at the scene of an ... emergency to the victim ... shall not be liable for any civil damages as a result of acts or omissions by such person in rendering the emergency care." We believe the Supreme Court of New Jersey would hold that this mandate protects TropWorld from liability in the situation before us.
 
 
 39
 The Lundys do not, and cannot, assert that there was bad faith here.[10] Rather, they seek to avoid the effect of New Jersey's Good Samaritan Act by relying on what is known as the "preexisting duty" exception to the Act. Under this exception, the Act provides no immunity from liability if the duty allegedly breached by the volunteer was a duty that existed prior to the voluntary activity. See, e.g., Praet v. Borough of Sayreville, 218 N.J.Super. 218, 527 A.2d 486 (1987) (police officers who have a preexisting duty to render emergency assistance to a motorist trapped in a car may be held liable for failing to extricate motorist and prevent fire). We do not believe the preexisting duty exception is applicable under New Jersey law in a situation, like the present one, where the preexisting duty is a limited one and the alleged negligence is the failure to provide a level of assistance beyond that required by the preexisting duty.
 
 
 40
 We think this becomes apparent when one focuses on the purposes of the Good Samaritan Act and the preexisting duty exception and on the nature of the preexisting duty in this case. The purpose of the Good Samaritan Act is to encourage the rendering of assistance to victims by providing that the voluntary rendering of aid will not give rise to any liability that would not otherwise exist. The preexisting duty exception recognizes that fulfillment of this objective of the statute can be accomplished without the eradication of preexisting duties.
 
 
 41
 Nurse Slusher had no preexisting duty to Lundy apart from her role as an employee of TropWorld (or, arguably, as an employee of an independent contractor of TropWorld). Nurse Slusher, if she had been a fellow patron, for example, would have had no preexisting duty obligation and she would have been fully protected by the Good Samaritan Act. Thus, the only relevant preexisting duty for purposes of applying the Act under New Jersey law is the preexisting duty owed by TropWorld to Mr. Lundy. That preexisting duty, as we have seen, was a duty limited to summoning aid and, in the interim, taking reasonable first aid measures. It did not include the duty to provide the medical equipment and personnel necessary to perform an intubation. It follows, we believe, that Nurse Slusher's conduct with respect to the providing or withholding of the intubation equipment on the premises was not conduct with respect to which she or TropWorld owed a preexisting duty to Lundy. It further follows that, if TropWorld is responsible for the assistance voluntarily provided by Nurse Slusher, it is protected by the Act from liability arising from her alleged negligence in failing to provide that intubation equipment.[11] Accordingly, we conclude that TropWorld's motion for summary judgment was properly granted.
 
 IV. THE LUNDYS' MOTION TO AMEND
 
 42
 Rule 15(c) sets forth the circumstances under which an amendment to a pleading will relate back to the date of the original pleading for limitations purposes. Prior to December 1, 1991, an amendment that "change[d] the party against whom a claim was asserted" related back to the date of the original complaint only if (1) "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," (2) within the period provided for commencing an action against the new party, the new party received such notice of the institution of the action that the new party would not be prejudiced in maintaining a defense on the merits, and (3) within that same period, the new party knew or should have known that "but for a mistake concerning the identity of the proper party," the action would have been originally filed against him or her. An amendment to Rule 15(c) which became effective on December 1, 1991, changed the second and third of these requirements by deleting the references to the period for commencement of an action and by substituting "the period provided by Rule 4(j) for the service of the summons and complaint." Rule 4(j) provides that if the summons and complaint are not served "within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why service was not made within that period, the action shall be dismissed." The Lundys contend that their amended complaint adding Dr. Carlino relates back to the date of the original complaint under the amended version of Rule 15(c) because all of the requirements of the rule were met within 120 days of the filing of their original complaint.[12]
 
 
 43
 The 1991 amendment also added to Rule 15(c) a new subsection (c)(1) providing that an "amendment of the pleadings relates back to the date of the original pleading when (1) relation back is permitted by the law that provides the statute of limitations applicable to the action." The Lundys urge that this provision is applicable to all amended complaints, including those that change the party against whom a claim is asserted. We accept this contention for present purposes.
 
 
 44
 Because the current version of Rule 15(c) came into effect after the original complaint was filed here, but while the case was still pending, there is some question as to whether the previous version of the rule governs, or whether the current version of the rule should be retroactively applied. However, because we believe that the Lundys' attempted amendment would not relate back to their original complaint under either version of Rule 15(c), we need not answer the question of retroactivity.
 
 
 45
 Dr. Carlino did not receive any notice of the institution of the Lundys' action within the applicable statute of limitations, which expired on August 3, 1991. Therefore, the Lundys' amendment would clearly not relate back to the original complaint if the previous version of Rule 15(c) applies.
 
 
 46
 Analysis under the current version of Rule 15(c) is a bit more complicated, yet it leads us to the same result. The complaint was filed on July 22, 1991, which was about two weeks before the expiration of the statute of limitations on August 3, 1991. The one hundred and twentieth day after the filing was November 19, 1991. The Lundys correctly point out that Dr. Carlino had received TropWorld's cross-claim on September 12, 1991 and had thus become aware of the existence of the suit at that time. The Lundys further stress that Dr. Carlino answered the cross-claim on October 18, 1991, and undoubtedly had reviewed their original complaint prior to filing that answer. It is their original complaint that the Lundys insist put Dr. Carlino on notice that "but for a mistake concerning identity of the proper party," the action would have been brought against him. Accordingly, we turn to that relatively brief complaint.
 
 
 47
 After identifying the parties and making the necessary jurisdictional allegation, the Lundys' complaint reads in relevant part:
 
 
 48
 2. At all times material hereto, Defendant acted, and failed to act, by and through its agents, servants, work persons and employees in the course and scope of employment.
 
 
 49
 3. On or about August 3, 1989, while Plaintiffs were business invitees lawfully on Defendant's premises, Plaintiff, Sidney Lundy, suffered a cardiac arrest.
 
 
 50
 4. At all time [sic] material hereto, Defendant, as the owner in possession of a hotel, restaurant and gambling complex open to the public, was under a duty to its business invitees to have proper first aid facilities and personnel available to its business invitees and was also under a duty to its business invitees to take reasonable action to render first aid to such business invitees, when necessary.
 
 
 51
 5. At all time material hereto, Defendant knew, and had reason to know, that Plaintiff had suffered a cardiac arrest and required first aid, oxygen and other medical attention.
 
 
 52
 6. Defendant negligently, recklessly and carelessly failed to perform its duty to Plaintiff by failing to have such emergency-first aid facilities, oxygen or medical personnel available.
 
 
 53
 7. Although Defendant telephoned for an ambulance to take Plaintiff to the hospital, it otherwise rendered no first aid or emergency medical treatment whatsoever to Plaintiff, despite his crucial need for same.
 
 
 54
 8. Due to all the foregoing, Defendant increased the likelihood of harm to the Plaintiff.
 
 
 55
 9. Due to all the foregoing, Defendant negligently, recklessly and carelessly caused serious and permanent bodily injuries to Plaintiff and caused aggravation and exacerbation of Plaintiff's injuries and hypoxic encephalopathy.
 
 
 56
 App. 10-11.
 
 
 57
 We agree with the Lundys that Dr. Carlino received notice of the existence of the litigation within 120 days of the filing of the complaint. We cannot agree, however, with their position that during that period he "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against" him. Like the district court, we conclude to the contrary.[13]
 
 
 58
 The Lundys' complaint asserted a claim against TropWorld on the theory that "as the owner in possession of a ... gambling complex open to the public" it had a duty to its business invitees that it breached by (1) failing to have "emergency-first aid facilities, oxygen or medical personnel available" and (2) by rendering "no first aid or emergency medical treatment whatsoever" to Mr. Lundy. This may or may not have appeared to Dr. Carlino to be a viable theory of liability against TropWorld. Clearly it must have communicated to him that the Lundys intended to sue someone else. Dr. Carlino would not have been liable under the theory advanced in the complaint, however, and we perceive no reason why it should have led Dr. Carlino to believe the Lundys intended to sue him and had failed to do so because of a mistake concerning identity.[14]
 
 
 59
 Where there is a basis for the plaintiff to assert liability against the party or parties named in a complaint and there is no reason for another party to believe that the plaintiff did anything other than make a deliberate choice between potential defendants, courts have consistently held that the third requirement of Rule 15(c)(3) is not met. See, e.g., Lovelace v. O'Hara, 985 F.2d 847 (6th Cir.1993) (complaint alleges theory of liability against public officer in official capacity; no basis for believing claim against official in individual capacity intended); Hernandez Jimenez v. Calero Toledo, 604 F.2d 99, 103 (1st Cir.1979) ("appellees could very well have believed that they were not named as parties in the original action for tactical reasons or because appellant lacked evidence of their alleged participation in the conspiracy when he filed the complaint"); Great Northeastern Lumber & Millwork Corp. v. Pepsi-Cola Metropolitan Bottling Co., Inc., 785 F.Supp. 514, 516 (E.D.Pa.1992) (manufacturer of component part in product liability situation "may have believed plaintiff made a deliberate choice rather than a 'mistake' in deciding not to join [it]").
 
 
 60
 This is such a case. The complaint gave Dr. Carlino no reason during the relevant period to believe that the Lundys had intended to sue him. Indeed, after TropWorld filed a cross-claim against him on September 12, 1991, and the Lundys failed during the remaining 51 days of the 120 day period to amend to join him, Dr. Carlino had affirmative reason to believe that the Lundys did not wish to assert liability against him.
 
 
 61
 Finally, we turn to the Lundys' contention that, because their amended complaint against Dr. Carlino relates back under New Jersey law, we should hold that it relates back here under the provisions of Rule 15(c)(1), as amended in 1991.
 
 
 62
 Rule 4:9-3 of the New Jersey Rules of Court states:
 
 When Amendments Relate Back
 
 63
 Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading; but the court, in addition to its power to allow amendments may, upon terms, permit the statement of a new or different claim or defense in the pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.
 
 
 64
 (emphasis added). This provision is virtually identical to the original version of Rule 15(c). Like that Rule, New Jersey's Rule 4:9-3 requires that for an amendment changing, or, presumably, adding a party to relate back, the new party must receive notice of the institution of the action prior to the running of the applicable statute of limitations. See Townsend v. Great Adventure, 178 N.J.Super. 508, 429 A.2d 601, 607 (App.Div.1981) (an amendment adding an additional defendant did not relate back to the original complaint pursuant to Rule 4:9-3 when there was "no showing that [the new defendant] received notice within [the applicable statute of limitations] that any action had been instituted by [plaintiff] against any person for his injuries and losses."). Because Dr. Carlino did not receive any notice of the Lundys' suit prior to the expiration of the statute of limitations, the Lundys' amendment does not relate back to their original complaint under New Jersey law. Accordingly, we reject the Lundys' argument that their claim against Dr. Carlino relates back to the date of their original complaint under Fed.R.Civ.P. 15(c), as amended in 1991.
 
 V. CONCLUSION
 
 65
 The judgment of the district court will be affirmed.
 
 
 66
 BECKER, Circuit Judge, concurring in part of the judgment and dissenting in part.
 
 
 67
 Federal Rule of Civil Procedure 15(c) was amended in 1991 "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense." FED.R.CIV.P. 15, advisory committee's note--1991 amendment. I believe that the majority has lost sight of the motivation behind the 1991 amendment to Rule 15 as well as of the plain meaning of that Rule, and thereby has deprived the plaintiff of his day in court on the basis of a mere technicality. I respectfully dissent from Part IV of the majority's opinion.
 
 
 68
 I concur with the majority, however, that Trop World was entitled to summary judgment on the issue of whether it breached a duty toward Lundy by not having more medical equipment and/or medically-trained personnel available in case of emergency, and hence I concur in much of Part III. However, I write separately on the issue of Trop World's duties toward Lundy because I disagree with the majority's conclusion that the New Jersey Supreme Court would rule that, even had Trop World been Nurse Slusher's employer, Trop World would still be entitled to summary judgment. While I agree with the majority that Trop World is not liable for Nurse Slusher's conduct only because she was employed by an independent contractor, I must discuss this point because if the majority is correct Dr. Carlino and Dr. Carlino, P.A. might be entitled to summary judgment even if they had been named as defendants from day one.[1]
 
 I. THE 1991 AMENDMENT OF RULE 15(c)
 
 69
 On April 30, 1991, the Supreme Court recommended an amendment to Rule 15(c)[2] and at the same time proposed an effective date of December 1, 1991. The stimulus behind the amendment was the harsh result in Schiavone v. Fortune, 477 U.S. 21, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986). In that case the plaintiffs had filed a timely libel complaint against "Fortune" rather than against "Time, Incorporated", the owner of the Fortune trademark. Time's registered agent had, based on the misnomer in the complaint, refused plaintiffs' service a short time after the statute of limitations expired, but within the time allowed for serving the summons and complaint. The plaintiffs served their amended complaint containing the defendant's correct name about two months later.
 
 
 70
 Confronted with the plain language of Rule 15(c), the Supreme Court held that the plaintiffs' claim against Time was time-barred.[3] It took the Rule's straightforward text to mean that the plaintiffs could not relate back the amendment of the defendant's name on the complaint unless the "new" defendant had notice of the suit prior to the expiration of the statute of limitations. See 477 U.S. at 30, 106 S.Ct. at 2384 ("We do not have before us a choice between a 'liberal' approach toward Rule 15(c), on the one hand, and a 'technical' interpretation of the Rule, on the other hand. The choice, instead, is between recognizing or ignoring what the Rule provides in plain language. We accept the Rule as meaning what it says.").
 
 
 71
 The Supreme Court recognized the spartan and admittedly arbitrary consequences of its holding and, acting on the recommendation of the Advisory Committee on Civil Rules and the Standing Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, soon thereafter recommended the aforementioned amendment to Rule 15(c), which Congress approved. The advisory committee, whose notes are accorded significant weight, see Schiavone, 477 U.S. at 31, 106 S.Ct. at 2385, explained that the new rule was designed
 
 
 72
 to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense.
 
 
 73
 * * * * * *
 
 
 74
 Paragraph (c)(3) ... has been revised to change the result in Schiavone v. Fortune, supra, with respect to the problem of a misnamed defendant. An intended defendant who is notified of an action within the period allowed by Rule 4(m) for service of a summons and complaint may not under the revised rule defeat the action on account of a defect in the pleading with respect to the defendant's name, provided that the requirements of clauses (A) and (B) have been met. If the notice requirement is met within the Rule 4(m) period, a complaint may be amended at any time to correct a formal defect such as a misnomer or misidentification. On the basis of the text of the former rule, the Court reached a result in Schiavone v. Fortune that was inconsistent with the liberal pleading practices secured by Rule 8.
 
 
 75
 FED.R.CIV.P. 15, advisory committee note--1991 amendment.
 
 
 76
 The fact that the result the Supreme Court reached in Schiavone led it shortly to amend the Rule is a sure reminder of the liberality of federal pleading practices. This liberality is expressed throughout the Rules[4] and is enshrined in a long and distinguished history.[5]
 
 
 77
 A. Retrospective Operation of the 1991 Amendment
 
 
 78
 Since Lundy conceded that the old Rule 15(c), which was in effect at the time he filed his complaint, would have barred his action against Dr. Carlino and Dr. Carlino, P.A. (collectively "the Carlinos"), the first question I must consider is whether the amendment applies retrospectively to cases pending in the district court at the time the amendment became effective.
 
 
 79
 Most courts of appeals have held that the amendment should normally operate retrospectively. See Woods v. Indiana University-Purdue University at Indianapolis, 996 F.2d 880, 886 (7th Cir.1993); Garvey v. Vaughn, 993 F.2d 776, 778, 783 n. 17 (11th Cir.1993); Skoczylas v. Federal Bureau of Prisons, 961 F.2d 543, 545-46 (5th Cir.1992); Hill v. United States Postal Serv., 961 F.2d 153, 155-56 (11th Cir.1992); Bayer v. United States Dep't of Treasury, 956 F.2d 330, 334-35 (D.C.Cir.1992). The Supreme Court, as authorized by the Enabling Act, 28 U.S.C.A. Sec. 2074 (Supp.1993), ordered the amended rule to be applied to all pending cases if "just and practicable."[6] There certainly is no practicability objection to its retrospective operation. Thus the only remaining question is whether it would be "just" to apply the rule retrospectively.
 
 
 80
 Without oversimplifying, the justice of retrospective operation has already largely been accounted for in the context of Rule 15(c)(3) by the very terms of the Rule. That is, insofar as the Rule demands an inquiry into "prejudice" to and "knowledge" of the party to be added, it is safe to dispense with the justness inquiry at the retrospectivity stage of the analysis. See Woods, 996 F.2d at 886. Simply put, if the party to be added had notice and is not prejudiced, and knew or should have known that it was an intended party, it would not be unjust to apply the new rule retrospectively to that party. These considerations lead me to conclude that Rule 15(c) retrospectively applies to this case.[7]
 
 B. Application of the Amended Rule
 
 81
 For an amendment to relate back under Rule 15(c), the party seeking the amendment must show that "the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." FED.R.CIV.P. 15(c)(3) (emphasis supplied). Although the majority dismisses Lundy's complaint against the Carlinos on the "mistake" prong, I will in the interest of thoroughness discuss notice and prejudice in proper order and then turn to the question of what the Carlinos knew or should have known.
 
 
 82
 1. Did the Carlinos Receive Adequate Notice?
 
 
 83
 The question whether the Carlinos received adequate notice is comprised of two subissues: (i) may notice by a codefendant ever satisfy the notice requirement of Rule 15(c)? and (ii) was there in fact sufficient notice to the Carlinos within the 120-day extension that Lundy had instituted an action?
 
 
 84
 The interesting notice issue in this case is whether notice can be supplied by an original defendant who files a cross-claim against the newly named defendant; in general, the question is whether the plaintiff must actually serve a summons and complaint on the newly named defendant before the expiration of the 120 day period. I believe, contrary to the decision by the district court, that the fact that the Carlinos received notice from a third party should not be dispositive, "since it is unwise to place undue emphasis on the particular way in which notice is received." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE Sec. 1497, at 93 (2d ed. 1990).
 
 
 85
 This Court has seldom spoken on the meaning of "notice" in context of Rule 15(c). We have held that notice of the institution of the action implies more than notice of the event giving rise to the cause of action, Bechtel v. Robinson, 886 F.2d 644, 652 n. 12 (3d Cir.1989), and that much cannot be doubted as Rule 15(c) by its terms requires "notice of the institution of the action " (emphasis supplied). A strict interpretation of notice was rendered under the pre-1991 incarnation of Rule 15(c) in Williams v. Army & Air Force Exchange Service, 830 F.2d 27 (3d Cir.1987), in which the plaintiff had filed a Title VII complaint against a federal agency rather than its head. This Court stated in a footnote that plaintiff's inquiries with the defendant agency did not place it on "notice" "[b]ecause only service constitutes notice." 830 F.2d at 30 n. 2 (emphasis supplied).
 
 
 86
 I think service by a third party defendant satisfies even the strict standard of Williams, assuming that part of the case remains good law after the 1991 amendment and in light of its possible inconsistency with the earlier case of Varlack v. SWC Caribbean, Inc., 550 F.2d 171, 175 (3d Cir.1977). All that matters according to the terms of the Rule is satisfactory notice that the plaintiff has instituted an action, not actual service naming the defendant. See Varlack, 550 F.2d at 175 (holding that the district court did not commit clear error when it held defendant had adequate notice of the lawsuit when he coincidentally saw a copy of the complaint naming both the restaurant where he was a manager and an unknown employee as defendants within the limitations period, because he knew that the "unknown employee" referred to him); 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE Sec. 1498, at 129-30 (arguing in context of third-party practice like that involved here that "the better practice is to determine the propriety of amendment in light of the Rule 15(c) notice requirements").
 
 
 87
 The language of amended Rule 15(c) and the advisory committee's notes undergird my view. Had the drafters of Rule 15(c) contemplated that only actual service with a complaint and summons naming the party to be added would suffice, they could have avoided the precise but complex language they actually used and simply provided in its stead that an amendment changing a party would relate back if within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment is in fact properly served according to Rule 4. This they did not do. Rule 15(c) by its terms requires only sufficient notice such "that the party will not be prejudiced in maintaining a defense on the merits."
 
 
 88
 The advisory committee note to the 1991 amendment--which, of course, postdates Williams--states that "[i]f the notice requirement is met within the Rule 4(m) period, a complaint may be amended at any time to correct a formal defect such as a misnomer or misidentification" (emphasis supplied). Although the advisory committee note does not explicitly mention service of process, it follows from the fact that the plaintiff cannot properly serve a party with process until the complaint names that party as a defendant (a predicate to the misnomer line of cases) that the note envisions that the plaintiff may, assuming appropriate notice is provided within the Rule 4(m) period, serve the defendant at any time, including after the expiration of the Rule 4(m) period. That is, a party may amend its pleadings to add a party although the party to be added was not actually served by the amending party with a complaint and summons within the Rule 4(m) period.
 
 
 89
 Having decided that actual service by the plaintiff is not a prerequisite under Rule 15(c)(3), the question then becomes what notice is sufficient to convey to the defendant the knowledge that the plaintiff has instituted an action. "The conclusion of a growing number of courts and commentators is that sufficient notice may be deemed to have occurred where a party who has some reason to expect his potential involvement as a defendant hears of the commencement of litigation through some informal means." Kinnally v. Bell of Pa., 748 F.Supp. 1136, 1141 (E.D.Pa.1990); see, e.g., Berndt v. Tennessee, 796 F.2d 879, 884 (6th Cir.1986) (notice need not be formal); Eakins v. Reed, 710 F.2d 184, 187-88 (4th Cir.1983) (same); Kirk v. Cronvich, 629 F.2d 404, 407-08 (5th Cir.1980) (same); Swartz v. Gold Dust Casino, Inc., 91 F.R.D. 543, 547 (D.Nev.1981) ("The notice of the institution of the lawsuit required by Rule 15(c) need not be formal."). I need not go so far as to embrace Kinnally 's liberal interpretation in this case, however, as the Carlinos actually received formal notice of Lundy's institution of a lawsuit when Trop World, within the period provided by Rule 4(m), served on them its Third Party Complaint with Lundy's Complaint attached to it.
 
 
 90
 In sum, given the close interrelationship between notice and prejudice generally and in Rule 15(c) specifically, at least when the newly named defendant has received formal notice of the commencement of the action, albeit via a cross-complaint, I conclude that such notice will satisfy Rule 15(c)'s notice requirement if the defendant is not prejudiced in maintaining a defense on the merits. Cf. 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE Sec. 1498, at 123 ("A finding that notice, although informal, is sufficient ... frequently [depends] upon determining whether the party to be added would be prejudiced by allowing relation back under the circumstances of the particular case."). This approach resists elevating technicalities over substance and defeating the policy that " 'mere technicalities' ... not stand in the way of consideration of a case on its merits." Torres v. Oakland Scavenger Co., 487 U.S. 312, 316, 108 S.Ct. 2405, 2408, 101 L.Ed.2d 285 (1988).
 
 
 91
 I consider next whether the Carlinos would be prejudiced in defending against Lundy's tort claim.
 
 
 92
 2. Would the Carlinos Be Prejudiced?
 
 
 93
 The Carlinos argue in their brief that they would be prejudiced (although at oral argument they conceded there would be no prejudice) because their initial involvement in the case was simply to defend a contractual claim for indemnity and that to now "begin [a] defense on a negligence theory would require a completely different legal strategy as well as discovery and investigation, all of which [Lundy] has already completed." Br. of Third Party Appellee at 8, 12-13. Nonbinding case law would support this contention (if it were true): prejudice may be established even though the defendant knows about and is involved in other, related actions if the defendant's lack of knowledge of that action led it to conduct a factual inquiry different from the one it would have conducted had it known of that action. See Craig v. United States, 413 F.2d 854 (9th Cir.), cert. denied, 396 U.S. 987, 90 S.Ct. 483, 24 L.Ed.2d 451 (1969).[8]
 
 
 94
 The issue of prejudice, being primarily a question of fact, should be resolved by the district court in the first instance. See Woods, 996 F.2d at 886. In this case, the magistrate judge was responsible for initially deciding Lundy's Motion to Add Carlino as Original Party Defendants. In granting the motion, the magistrate judge rejected the Carlinos' argument that they would be prejudiced if added as defendants (see App. 466a-69a (Letter Br. of Third Party Defendant, at 2-4 (June 22, 1992))), finding instead that the "Carlino[s] will not be prejudiced by the amended complaint because as third party defendants, they have already engaged in the preparation of a defense in this action." Mem.Op., Civ. No. 91-3183(WGB), at 7 (D.N.J. July 7, 1992) (Rosen, Mag. J.), in App. at 477a. Given the overwhelming support in the record for the magistrate judge's conclusion,[9] I agree that the Carlinos suffered no prejudice on account of Lundy's belated attempted amendment of his complaint to name them as defendants.[10]
 
 
 95
 Based on the foregoing, I conclude that the elements of Rule 15(c)(3)(A) have all been met. It remains to be seen if the same holds for the elements of Rule 15(c)(3)(B).3. Should the Carlinos Have Known Lundy Was Mistaken
 
 
 96
 About Their Identity?
 
 
 97
 a. Was Sufficient Notice Provided by the Third-Party Complaint?
 
 
 98
 In order for an amendment under Rule 15(c)(3) to relate back, the party seeking the amendment must also demonstrate that "the party to be brought in by amendment ... (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." FED.R.CIV.P. 15(c)(3)(B). The mistaken identity issue here can be separated into two subissues: (i) is mistaken identity limited to cases of misnomer or improper naming or does it also extend to cases where the plaintiff was mistaken about the identity of a separate defendant? and (ii) did the Carlinos know, or should they have known, that but for a mistake they would have been named as defendants from the outset? The majority disposes of Lundy's claims without reaching the merits ostensibly because "Dr. Carlino [had] no reason during the relevant period to believe that the Lundys had intended to sue him." Maj.Op. at 1183.
 
 
 99
 Lundy contends that on a fair reading of Paragraphs 2 and 4-8 of his Complaint,[11] the Carlinos knew or should have known that the claims were equally applicable to them and that, but for a mistake concerning the employer of Nurse Slusher, that Lundy would have named the Carlinos as defendants from the outset of the litigation. Br. of Appellant at 37. Agreeing, the magistrate judge ruled that within the 120-day allowance of (then) Rule 4(j) the Carlinos "should have been aware that but for a mistake concerning the appropriate employer of Ms. Slusher, the initial action would have been brought directly against [them]." Mem.Op., Civ. No. 91-3183(WGB), at 7 (D.N.J. July 7, 1992) (Rosen, Mag. J.), in App. at 477a. The district court purported to subject the magistrate judge's ruling that the Carlinos should have known they were intended defendants to the "clearly erroneous or contrary to law" standard of Federal Rule of Civil Procedure 72(a). Mem.Op. at 14-15 (App. 622a-23a); see Snow Machines, Inc. v. Hedco, Inc., 838 F.2d 718, 727-28 (3d Cir.1988).
 
 
 100
 Laboring under what it believed to be a "clearly erroneous" standard of review as to the facts, the district court reversed the magistrate judge's conclusion purely on legal grounds.[12] In particular, the district court held that Rule 15(c)(3) does not allow a party to add a "new defendant," but instead allows only the correction of a "misidentification of a defendant." Mem.Op. at 22, 24-25 (App. at 630a, 632a-33a). As developed infra at 1181-82, ruling is contrary to precedent binding on the district court, and the majority does not hold otherwise, see Maj.Op. at 1183 n. 14. Alternatively, the district court concluded that a Third Party Complaint cannot as a matter of law suffice to put the party to be added on notice that the plaintiff had made a mistake of identity. See Mem.Op. at 23-25. I have explained my reasons for disagreeing with this conclusion supra in Part I.B.1.
 
 
 101
 The majority does not rest its conclusion on either of these two legal grounds, though. Since the district court left the magistrate judge's finding of fact undisturbed (that is, adopted it as correct for our purposes), as the majority acknowledges, see Maj.Op. at 1183 n. 14, we are to review the factual conclusion that the Carlinos should have known that they were intended defendants for clear error. See Varlack v. SWC Caribbean, Inc., 550 F.2d 171, 174 (3d Cir.1977) (establishing that the question of whether the conditions of Rule 15(c), including whether the party to be added "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him," have been met is a question of fact subject to review for clear error ). Accordingly, the majority seems to be holding that the magistrate judge clearly erred in his finding, see Maj.Op. at 1183 n. 14, although it fails to point to any contrary evidence in the record besides the allegations in Lundy's Complaint and Lundy's delay.
 
 
 102
 (1) Adding a Party Under Rule 15(c)(3)(B)
 
 
 103
 Regarding the first issue, Rule 15(c) on its face applies to the changing of a party, not just to correcting a misnomer. The plain language of the rule states that the requirements of Rule 15(c)(3) apply to "amendment[s] chang[ing] the party or the naming of the party" and therefore Rule 15(c) most clearly contemplates that changing a party can relate back. Since the Rule on its face draws no distinction between the two scenarios, I feel constrained to conclude that Rule 15(c)(3) allowed Lundy to relate back the addition of the Carlinos as defendants. See Business Guides, Inc. v. Chromatic Communications Enters., Inc., 498 U.S. 533, 540, 111 S.Ct. 922, 928, 112 L.Ed.2d 1140 (1991) (holding that courts are to " 'give the Federal Rules of Civil Procedure their plain meaning' " (quoting Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120, 123, 110 S.Ct. 456, 458, 107 L.Ed.2d 438 (1989))).
 
 
 104
 Adding a party is essentially no different from changing a party. The minor difference between the addition and the replacement of a party is whether the original defendant is dismissed in addition to the new defendant being added, which is not ipso facto conclusive as to what the defendant to be added knew or should have known concerning whether the plaintiff was mistaken about the newly-added defendant's identity. Most courts have thus held that a new party may be added or substituted for another.[13] Most importantly, this Circuit has interpreted Rule 15(c) to allow for the addition of a new party. See Bloomfield Mech. Contracting, Inc. v. Occupational Safety & Health Review Comm'n, 519 F.2d 1257, 1262 (3d Cir.1975) (explaining, in the context of the addition of other parties, that the purpose of Rule 15(c) "is to ameliorate the effect of a statute of limitations where the plaintiff has sued the wrong party but where the right party has had adequate notice of the institution of the action" (emphasis supplied)).
 
 
 105
 Allowing for the addition of a new party is particularly compelling in circumstances where, as here, the need for the addition was caused by the plaintiff's misunderstanding concerning the fact that two separate legal entities were operating within the same physical structure. Certainly the separate legal entity (in this case the Carlinos), especially when it is not normally expected to be engaged at the premises (as presently is the case), has reason to know that it has not been named because of ignorance of its separate legal existence. That is true even more so in a case such as this where the plaintiff was unconscious during the happening of the relevant events and hence obviously could not have been aware of such legal niceties.
 
 
 106
 (2) What the Carlinos Should Have Known
 
 
 107
 As to the second subissue, concerning what the Carlinos knew or should have known, Lundy asserts that the Carlinos should have known that, but for Lundy's mistake concerning Nurse Slusher's employer, Lundy would have named them as defendants when he first filed his complaint. I agree with Lundy that the magistrate judge did not clearly err. First, Lundy's Complaint indicated that he was proceeding under a theory of respondeat superior. See App. 10a (Complaint p 2). Given the lax nature of notice pleading under the Federal Rules of Civil Procedure[14] and the circumstance that Lundy was without his faculties during the relevant time frame, it was not incumbent upon Lundy to name the particular employees involved and not involved in his medical emergency, the majority's implications notwithstanding, see Maj.Op. at 1183 n. 14 (apparently conceding that, had Lundy expressly named Nurse Slusher, the Carlinos should have known of the mistake).
 
 
 108
 In addition, Lundy alleged that the substance of Trop World's negligence was its failure to provide proper first aid facilities and medical treatment. See App. 11a (Complaint pp 5-7). Thus, had Nurse Slusher and Dr. Carlino been employees of Trop World instead of independent contractors, anyone would immediately conclude that Trop World should have known that in his complaint Lundy alleged that Nurse Slusher's and/or Dr. Carlino's negligence caused Lundy's injuries. The fact that another entity was Nurse Slusher's employer does not take much away from the force of the conclusion that her employer was fully implicated in the lawsuit. Since the Carlinos knew that they and not Trop World were responsible for Nurse Slusher and the medical facilities at Trop World, the Carlinos should have known that (1) Nurse Slusher's alleged negligence and Trop World's alleged negligent failure adequately to prepare for medical emergencies was the gravamen of Lundy's complaint (the merits of this claim are, of course, irrelevant at this juncture); (2) Lundy was simply confused about the employer of Nurse Slusher; and (3) Lundy was unaware that Trop World had delegated to the Carlinos the responsibility to provide medical care to patrons and guests. Had the Carlinos, charged with familiarity with the events of that evening, genuinely considered whether they were intended defendants when served by Trop World, they would have concluded "very likely," and I think that satisfies Rule 15(c)(3)(B).
 
 
 109
 In my view, no competent attorney cognizant of the federal rules reading Lundy's complaint and aware of the facts as known to the Carlinos would have thought the Carlinos were completely off the hook. One cannot expect Lundy to have possessed the prescience to discover that Nurse Slusher was an independent contractor rather than an employee before filing his complaint. The majority does not suggest why the Carlinos could reasonably expect that Lundy knew this fact and was merely making a "strategic" choice not to sue the responsible entity. It will be when this opinion is filed that the Carlinos for the first time since receiving Trop World's Third Party Complaint will be able to breathe a sigh of relief.
 
 
 110
 The cases the majority relies upon are readily distinguishable. Lovelace v. O'Hara, 985 F.2d 847, 850-51 (6th Cir.1993) held that the defendant in an action under 42 U.S.C.A. Sec. 1983 (1981) had no reason to believe that the plaintiff would amend her complaint to sue him in his individual capacity because the plaintiff's original complaint unequivocally "evidence[d] an intentional choice ... to bring an official capacity suit." There the plaintiff had known of the defendant's identity and exact involvement in the events responsible for the case all along. Moreover, the court stressed that the amendment would have prejudiced the defendant, since the amendment would have exposed the defendant to personal liability, altered the elements of recovery and defense, and required major changes in pleading, discovery, trial preparation, and selection of witnesses. Similarly, in Curry v. Johns-Manville Corp., 93 F.R.D. 623, 626-27 (E.D.Pa.1982) the court held that a third-party claim by the original defendant did not provide the third-party defendant with reason to know that plaintiff may sue it where plaintiff actually knew the identity of the third-party defendant and its part in the underlying events long before the expiration of the statute of limitations. Those cases share the common rationale that, where the defendant that the plaintiff seeks to add knew that the plaintiff was aware long before the statute of limitations expired both of that defendant's particular role in the underlying events and of its separate legal identity, that defendant was reasonably led to believe that the plaintiff deliberately chose not to name it as a defendant from the outset. That rationale is inapposite to this case.
 
 
 111
 b. The Matter of Lundy's Delay in Amending His Complaint
 
 
 112
 Moreover, I am driven to conclude that Lundy's lengthy, unexcused delay in amending his complaint does not affect the analysis of whether the Carlinos should have known that, but for a mistaken identity, Lundy would have named them in his original complaint. Although the Carlinos do not phrase it as such, they essentially argue that Lundy inexcusably neglected to name them as defendants for approximately eight months after Lundy learned that the Carlinos were Trop World's independent contractors. See Br. of Third Party Appellee at 8-9, 13.[15] The district court espoused a similar legal theory, and the majority also seems to latch onto it. See Maj.Op. at 1183; Slip Op. at 23, in Br. of Appellant at 67.
 
 
 113
 Some courts of appeals specifically include undue delay as a component of the "should have known" prong of the Rule 15(c) analysis. But those cases are in the main very different, because in them the parties to be added never had notice during the Rule 4(m) period that they were intended defendants in the action in question, and the plaintiff's procrastination occurred during the limitations period.[16]
 
 
 114
 More on point is Seber v. Daniels Transfer Co., 618 F.Supp. 1311, 1313-14 (W.D.Pa.1985). There the court allowed the plaintiff to relate back his second amended complaint filed on August 6, 1984, to the date of his original complaint, March 30, 1984. The statute of limitations on plaintiff's age discrimination claim expired on April 1, 1984. The court found there was no "undue delay" despite the four months it took plaintiff to amend his complaint because "counsel underwent a contentious period of discovery during which it may have been difficult to identify all responsible parties and their positions." Id. at 1314. The court did not find the delay dispositive, but held instead that the "plaintiff here may take advantage of a rule designed to prevent overly technical applications of the statute of limitations where it appears that responsible parties will not be unfairly prejudiced in defending against an otherwise untimely lawsuit." Id.
 
 
 115
 As the Court of Appeals for the Tenth Circuit sagaciously pointed out in Anderson v. Deere & Co., 852 F.2d 1244, 1247-50 (10th Cir.1988),[17] so long as the defendant had notice, was not prejudiced, and should have known of plaintiff's mistake within 120 days of the expiration of the statute of limitations, the language of Rule 15(c) does not distinguish between timely and untimely amendments. See FED.R.CIV.P. 15(c) advisory committee note--1991 amendment (assuming the other requirements are met, "a complaint may be amended at any time to correct a formal defect such as a misnomer or misidentification" (emphasis supplied)). Conspicuously absent from Rule 15(c) is any hint that the complaint must be amended within the Rule 4(m) period--it speaks only of notice, lack of prejudice, and reason to know of a mistake within that time frame. S ee supra at 1179. Obviously receipt of service after amendment of the complaint would provide all three, but it is not a prerequisite. The courts to hold otherwise neglect the liberal policy supporting the Rules and essentially punish the plaintiff when no prejudice or harm results to the defendant.
 
 
 116
 Rule 15(c) is subject to Rule 15(a), which provides that a court shall freely give leave for a party to amend its pleadings "when justice so requires." That subsection, not Rule 15(c), is the correct one to deal with the delay aspect of the amendment. No doubt undue delay causing prejudice could bar Lundy from amending his complaint to add a newly-named defendant under Rule 15(a) because in such situations justice would not require it. See, e.g., Adams v. Gould Inc., 739 F.2d 858, 867-68 (3d Cir.1984) ("[U]nder the liberal pleading philosophy of the federal rules as incorporated in Rule 15(a), an amendment should be allowed whenever there has not been undue delay, bad faith on the part of the plaintiff, or prejudice to the defendant as a result of the delay."). This Court has often held that, absent undue or substantial prejudice, an amendment should be allowed under Rule 15(a) unless "denial [can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment." Bechtel v. Robinson, 886 F.2d 644, 652-53 (3d Cir.1989) (internal quotation omitted); Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of V.I., Inc., 663 F.2d 419, 425 (3d Cir.1981) (same), cert. denied, 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).
 
 
 117
 Similar in result is Skehan v. Board of Trustees, 590 F.2d 470 (3d Cir.1978), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979), in which the district court had not even addressed Rule 15(c) since it refused to allow an amendment under Rule 15(a) regardless of whether Rule 15(c) would countenance it. There we held that "[a]lthough district courts are required to allow amendments under the terms of [Rule 15(a) ], certain factors, such as undue prejudice to the other party and undue delay by the movant, have been found to establish sufficient justification for the denial of such motions." Id. at 492 (emphasis supplied).[18] That is because "prejudice to the nonmoving party is the touchstone for the denial of the amendment." Arco Chem. Co., 921 F.2d at 488 (quoting Bechtel, 886 F.2d at 652) (internal quotations omitted); see Evans Prods. Co. v. West Am. Ins. Co., 736 F.2d 920, 923 (3d Cir.1984) ("The primary consideration in determining whether leave to amend under FED.R.CIV.P. 15(b) should be granted is prejudice to the opposing party."). But as discussed above, see supra Part I.B.2, the Carlinos were not prejudiced by Lundy's delay.
 
 
 118
 Moreover, this Court has repeatedly stated outright that unexcused delay unaccompanied by real detriment to the defendant or to the judiciary does not constitute undue delay.[19] That is because undue delay refers solely to delay in the proceedings, not to delay in amending the pleadings.[20] The animating spirit of Rule 15, in short, does not sanction a ruling that would punish a party for delaying an amendment to the complaint. See Anderson, 852 F.2d at 1248-49 & n. 15 (suggesting, though, that Rule 11 sanctions may be appropriate).
 
 
 119
 To summarize, in this case the Carlinos suffered no actual prejudice, and, the amendment having occurred before trial was scheduled, there was no undue delay in the proceedings. Hence Lundy's delay in amending his complaint to name the Carlinos as defendants is completely beside the point. Consequently, I conclude that the district court should have allowed Lundy to amend his complaint to add the Carlinos as original party defendants.[21]
 
 
 120
 As a final note on the delay factor, it has not eluded me that the Carlinos were intent on not getting themselves involved in this lawsuit. At no time did they seek or receive assurances that Lundy would not add them as defendants. For this reason, I do not believe the delay was material to what the Carlinos should have known: once having been put on notice during the limitations period, the absence of a quick amendment did not take them off notice. Cf. Kilkenny, 800 F.2d at 857 (plaintiff was informed of the proper defendants long before expiration of the limitations period) ("A plaintiff's failure to amend its complaint to add a defendant after being notified of a mistake concerning the identity of a proper party ... may cause the unnamed party to conclude that it was not named because of strategic reasons rather than as a result of plaintiff's mistake." (emphasis supplied)); Potts v. Allis-Chalmers Corp., 118 F.R.D. 597, 608-09 (N.D.Ind.1987) (same).
 
 
 121
 Moreover, considering the parties' repeated and close interactions, the Carlinos could easily have set their minds at ease, but did not, perhaps in the hope that they would obtain the outcome the majority now hands them. Hence I do not agree with the majority that the Carlinos' suspicions evaporated over time (even assuming that were relevant), or, indeed, with its hyperbole that the Carlinos "had affirmative reason to believe that the Lundys did not wish to assert liability against [them]." Maj.Op. at 1183.
 
 
 122
 Based on the foregoing, I would vacate the district court's order and decision denying Lundy's motion to relate back the amendment of his pleadings to add the Carlinos as original party defendants, and remand with instructions to reconsider the magistrate judge's recommendation using the proper legal standards.
 
 
 123
 II. DUTIES A LANDOWNER OWES A BUSINESS INVITEE IN NEW JERSEY
 
 
 124
 Although I concur with the majority in its disposition of Lundy's claim against Trop World in Part III.A of the majority opinion, I write separately to express my disagreement with the majority's conclusion in Part III.B that under New Jersey tort law Trop World would be entitled to summary judgment even if Nurse Slusher had been its employee. See Maj.Op. at 1179-80, 1180-81. Although the precise holding reached by the majority escapes me, see infra at 1191-92, the majority appears to conclude that Trop World fully satisfied its duties toward Lundy when it called for emergency help.
 
 
 125
 Because I conclude that Trop World was under a duty to take reasonable affirmative steps to assist Lundy when he suffered a cardiac arrest in addition to summoning emergency care, a position the majority at points appears to accept hypothetically to be the law, see Maj.Op. at 1179-80, 1180-81, I do not believe that New Jersey's Good Samaritan Act, 2A N.J.STAT.ANN. Sec. 62A-1, would shield Trop World (according to the majority's hypothetical) from liability were it Nurse Slusher's employer, or the Carlinos from liability had they effectively been made defendants in this case. I also believe that the question whether Nurse Slusher behaved reasonably under the circumstances when she refused to retrieve the intubation kit from her office when Dr. Greenberg requested it is a question a jury should answer.A. General Principles of New Jersey Tort Law
 
 
 126
 Absent a duty, a party cannot be held liable for negligent conduct under principles of New Jersey negligence law. See Weinberg v. Dinger, 106 N.J. 469, 524 A.2d 366, 373-74 (1987). In New Jersey, the question whether a duty exists is a matter of law and rests largely on questions of fairness and public policy. Cheng Lin Wang v. Allstate Ins. Co., 125 N.J. 2, 592 A.2d 527, 534 (1991); Kelly v. Gwinnell, 96 N.J. 538, 544, 476 A.2d 1219, 1222 (1984). " 'The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.' " Cheng Lin Wang, 592 A.2d at 534 (quoting Kelly, 96 N.J. at 544, 476 A.2d at 1222). I bear in mind that the New Jersey Supreme Court values flexibility, see Wytupeck v. Camden, 25 N.J. 450, 462, 136 A.2d 887 (1957), and that in New Jersey the question whether or not a duty exists will depend on the facts of each case, Cheng Lin Wang, 592 A.2d at 534.
 
 
 127
 New Jersey has set the standard of care a landowner owes another based on the relationship or status between the parties. See Snyder v. I. Jay Realty Co., 30 N.J. 303, 153 A.2d 1, 5 (1959). New Jersey distinguishes among invitees, who "first come by invitation, express or implied;" licensees, "who are not invited but whose presence is suffered;" and trespassers, who "are neither invited nor suffered." Id. (internal quotations omitted). All parties agree that Lundy was a business invitee. See Br. of Appellant at 17; Br. of Appellee at 13. With this background in mind, I will tackle the formidable question whether a jury could find that the Carlinos (or Trop World, assuming it was Nurse Slusher's employer) breached a standard of care they owed to Lundy.[22]
 
 
 128
 B. Duties Arising from the Landowner-Invitee Relationship
 
 
 129
 Neither the parties nor I has found any decision by the New Jersey Supreme Court, or any other New Jersey court, treating the question presented, namely, the scope of a business' duty, if any, to aid or assist a business invitee when an invitee requires emergency aid through no fault of the landowner.[23] In this predicament I cannot help but resort to treatises and decisions in sister jurisdictions to divine how the New Jersey Supreme Court would rule, keeping in mind its general policies toward tort liability.[24]
 
 
 130
 As the majority notes, the early common law of England, later transposed to the United States, did not recognize a duty to rescue or assist another who was too ill to take care of him- or herself. A sense of rugged individualism combined with the harsh realities of industrialization formed an impenetrable shield of immunity around all who failed to help, even those who could, with the greatest of ease, prevent the most violent and senseless of deaths. Over the years, as commentators decried these decisions as revolting and an outrage to the moral conscience, courts worked widening inroads on that antiquated and perverse doctrine.
 
 
 131
 The clearly prevailing view today is that social policy justifies the imposition of a duty to act if one of a burgeoning group of special relationships exists between the parties. See generally W. PAGE KEETON ET AL., THE LAW OF TORTS Sec. 56, at 373-76 (5th ed. Lawyers ed. 1984); 3 FOWLER V. HARPER ET AL., THE LAW OF TORTS Sec. 18.6, at 718-21 (2d ed. 1986). Absent such a special relationship, the unquestionably widely prevailing view still is that there is no duty to rescue the helpless. See, e.g., REST.2D TORTS Sec. 314 & cmt. c (1965). See generally Jay Silver, The Duty to Rescue: A Reexamination and Proposal, 26 WM. & MARY L. REV. 423 (1985).
 
 
 132
 The special relationship bearing on this case is that between a business and an invitee. S ee supra at 1191. The Restatement (Second) of Torts Sec. 314A[25] succinctly explains the business' duty in that context:
 
 
 133
 (1) A common carrier is under a duty to its passengers to take reasonable action
 
 
 134
 (a) to protect them against unreasonable risk of physical harm, and
 
 
 135
 (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
 
 
 136
 . . . . .
 
 
 137
 (3) A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.
 
 
 138
 REST.2D TORTS Sec. 314A (emphasis supplied). The essential imperative to be drawn from this language is the directive of "reasonable action."
 
 
 139
 Contrary to the apparent holding of the majority, see infra at 1191-1192, I deduce from the case law that "reasonable action" may exceed the mere summoning of emergency care. The modern, general common law recognizes that, where the law imposes a duty to rescue, in harmony with general principles of negligence law it demands of those subject to the duty of reasonable care under the circumstances. See KEETON ET AL., THE LAW OF TORTS Sec. 56, at 377. For example, one renowned commentator writes that the one owing the duty "will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick person over to a doctor or to those who will look after him until one can be brought." Ibid. (emphasis supplied); accord REST.2D TORTS Sec. 314A cmt. f.[26]
 
 
 140
 Based on these sources, I believe that the New Jersey Supreme Court would recognize that a business owes its invitees a duty thus circumscribed. But I cannot canvass only learned works, but must sojourn forth beyond New Jersey's frontiers to survey its sister jurisdictions in order to gain a sense of how this duty has played out in similar situations. Though I have located no case on all fours with the one sub judice, the cases I have found generally support the views of the commentators and the Restatement quoted above, and many are close enough to provide fruitful guidance. I enumerate them in the margin.[27]
 
 
 141
 Although, as already stated, no New Jersey case directly on point has been found, some older, related decisions confirm that the New Jersey Supreme Court would likely announce the duties as I have described them. The most pertinent case is Szabo v. Pennsylvania R.R. Co., 132 N.J.L. 331, 40 A.2d 562 (1945), in which the predecessor court to the New Jersey Supreme Court pinpointed the standard of care an employer owes an employee:
 
 
 142
 It is conceded that in this and other jurisdictions the law is, that in the absence of a contract or a statute, there rests no duty upon an employer to provide medical service or other means of cure to an ill, diseased or injured employee, even though it result[s] from the negligence of the master.
 
 
 143
 In our judgment there is a sound and wise exception to this rule, founded upon humane instincts.
 
 
 144
 That exception is, that where one engaged in the work of his master receives injuries, whether or not due to the negligence of the master, rendering him helpless to provide for his own care, dictates of humanity, duty and fair dealing require that the master put in the reach of such stricken employee such medical care and other assistance as the emergency, thus created, may in reason require, so that the stricken employee may have his life saved or may avoid further bodily harm. This duty arises out of strict necessity and urgent exigency. It arises with the emergency and expires with it.
 
 
 145
 Szabo, 40 A.2d at 562 (citations omitted) (emphasis supplied); accord Lanier v. Kieckhefer-Eddy Div. of Weyerhaeuser Timber Co., 84 N.J.Super. 282, 201 A.2d 750, 753-54 (1964). The court explained that, while the foreman "was not called upon to correctly diagnose decedent's particular ailment," he should have known of decedent's inability to care for himself, and it was a question for the jury whether the employer breached his duty by simply delivering decedent to his home, where he was left helpless and alone, instead of to his family, a physician, or a hospital. See Szabo, 40 A.2d at 562-63; accord Burns v. Bakelite Corp., 17 N.J.Super. 441, 86 A.2d 289, 290-91, certif. denied, 9 N.J. 335, 88 A.2d 366 (1952). I read Szabo and its progeny as fully in support of my view that, under New Jersey Law, a business has a duty to summon medical aid and take other reasonable steps to assist its invitees who fall helplessly ill, but not actually to prepare for such contingencies or to provide medical aid beyond the pre-existing abilities of those who happen to be present.
 
 
 146
 I therefore conclude that the New Jersey Supreme Court would, if presented with a case like this one, hold that the business owed the invitee a (preexisting) duty to summon medical aid reasonably promptly and to take other reasonable steps under the circumstances to save its invitees from emergencies beyond the invitee's or his or her companions' capacity to ward off, but would not further require the business to afford the invitee first aid or emergency medical care or equipment beyond that which happens to be reasonably available at the time of the emergency.[28]
 
 
 147
 As already said, I agree with the majority, in light of the arguments raised in Lundy's brief, that Trop World did not breach its duty to summon medical assistance promptly.[29] But I am far less convinced that Nurse Slusher acted reasonably in refusing to fetch the intubation kit located close by when Dr. Greenberg requested it, enough so that I believe a jury should be empaneled to consider this point.
 
 
 148
 The pertinent facts established by the deposition testimony are as follows. An intubation kit, or at least enough of the equipment to make do, was inventoried in Nurse Slusher's office, one floor above the pit where Lundy lay fighting for his life. App. at 217a (Dep. of Dr. Greenberg); App. at 153a, 154a-55a (Dep. of Nurse Slusher). After Nurse Slusher arrived at the scene, Dr. Greenberg identified himself as a doctor and requested an intubation kit. App. at 212a, 215a (Dep. of Dr. Greenberg); App. at 241a-42a (Dep. of Mrs. Greenberg). Nurse Slusher responded that Trop World policy prevented her from employing an intubation kit, and she apparently misrepresented that no intubation kit was on the premises. App. at 216a (Dep. of Dr. Greenberg); App. at 241a-42a (Dep. of Mrs. Greenberg). Because there were two doctors and another registered nurse in attendance, App. at 159a, 161a-62a (Dep. of Nurse Slusher), and because the other registered nurse alternated using the ambu-bag on Lundy with Nurse Slusher, App. at 240a-41a (Dep. of Mrs. Greenberg), a jury could reasonably conclude that someone other than Nurse Slusher could have operated her ambu-bag while she made haste to secure the intubation kit such a short distance away from a dying man.
 
 
 149
 Of course, insofar as Trop World was under no preexisting duty to render first aid to Lundy in the first place, to the extent it did so New Jersey's Good Samaritan Act would shield it from liability (so long as it acted in good faith). See Maj.Op. at 1179-80. Again, I emphasize that I think there is a jury question of negligence here only because a jury could view getting the intubation kit from the office and handing it to Dr. Greenberg to be a reasonable step (and hence one which would fall within its "preexisting duty"), as it does not encompass rendering first aid beyond the actual preexisting ability of anyone present in the normal course of things to perform. That is, if the jury were to view that step as reasonable in light of the proximity of the intubation kit and the medical emergency at hand, then Trop World would have been under a "preexisting duty" to take that step, and the Good Samaritan Act would not shelter its failure to do so. See Praet v. Borough of Sayreville, 218 N.J.Super. 218, 527 A.2d 486, 489 (1987) (holding that the Good Samaritan Act does not immunize "one who has either a contractual, relational, or a transactional duty to render assistance" (emphasis supplied)). Here, Nurse Slusher did not retrieve the intubator kit available to her when Dr. Greenberg requested it, an act which would not itself comprise the furnishing of medical care but which a jury could reasonably consider to be simply a reasonable step not too dissimilar from summoning emergency care.
 
 
 150
 I am puzzled by the majority's opinion in this respect. First, it seems to assume, for the sake of argument, that Trop World owed Lundy the "preexisting duty" to "provide such first aid prior to the arrival of qualified assistance as the [casino's] employees are reasonably capable of giving." Maj.Op. at 1179-80. Moreover, operating under its hypothetical that Nurse Slusher was a Trop World employee, it assigns those same duties to Nurse Slusher. Maj.Op. at 1180-81. But then it decides that Nurse Slusher's assumed duty to "provide such first aid" as she was "reasonably capable of giving" does not include running up a flight of stairs to retrieve a medical device for a doctor attending a critically ill patient. See Maj.Op. at 1180-81.
 
 
 151
 Although the majority does not spell it out, I surmise that it did not mean to say that Nurse Slusher was not "reasonably capable" of running up a flight of stairs to retrieve the potentially life-saving intubation kit. Thus, it must have concluded Nurse Slusher breached no duty toward Lundy because, as a matter of law, it is not "first aid" for a nurse to retrieve a nearby medical instrument for a doctor in an emergency. That conclusion, however, leaves me perplexed, even leaving aside any notion of "the greater includes the lesser" (that is, that the greater duty to provide reasonable first aid includes the lesser duty to take reasonable steps other than the provision of minimal emergency medical care, § ee supra at 1200 n. 27 (discussing cases)). I simply do not understand why the majority concludes as a matter of law that Nurse Slusher breached no "preexisting duty" toward Lundy.
 
 
 152
 Based on the fact pattern in this case, I conclude that a jury should properly determine whether Nurse Slusher's employer (by operation of respondeat superior ) acted reasonably under the circumstances as described or whether it breached its duty toward Lundy. Accordingly, I respectfully dissent from the majority's contrary conclusion.
 
 III. CONCLUSION
 
 153
 Because I believe that Rule 15(c) authorizes the relation back of amendments adding a new party and that the Carlinos were afforded proper notice of the institution of this action when served with Lundy's Complaint by Trop World in its Third-Party Complaint, I would reverse the district court's contrary legal conclusions and remand for its reconsideration using the correct legal standard of the magistrate judge's findings of fact and conclusions of law. Therefore I respectfully dissent from the majority's judgment affirming the district court's refusal to permit Lundy to amend his Complaint to relate back his addition of the Carlinos as defendants.
 
 
 154
 I also note my disagreement with the majority's conclusion that, even were Trop World Nurse Slusher's employer, it would be entitled to summary judgment. Nevertheless, because Nurse Slusher was employed by an independent contractor (the Carlinos), and because Lundy has not appealed the district court's ruling that under New Jersey law Trop World could not be held accountable for their conduct, I concur with the majority's judgment that Trop World is entitled to summary judgment.
 
 SUR PETITION FOR REHEARING
 Aug. 12, 1994
 
 155
 BEFORE: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, and McKEE, Circuit Judges, and RESTANI,* Judge, United States Court of International Trade.
 
 
 156
 The petition for rehearing filed by appellants in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 
 *
 Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation
 
 
 [1]
 The proposed amendment would have added both Dr. Carlino and Dr. Domenic Frank Carlino, a Professional Association. For simplicity, we will refer to both as Dr. Carlino
 
 
 [2]
 Dr. Greenberg testified that an ambu-bag is a "device that's utilized to assist in respiration when a person is either unable to breathe on his own or is having difficulty breathing.... It's usually a cylindrical-sort-of-shaped plastic bag with a face mask attached to it that is applied over the person's mouth and nose, and subsequent pressure on the bag will allow for air to be entered into the person's nose and mouth.... It's [a] purely mechanical [device]." App. 213-14
 
 
 [3]
 The device known as an airway is a plastic apparatus that keeps the mouth open and holds the tongue in place. App. 165
 
 
 [4]
 According to Dr. Greenberg, an intubation kit consists of equipment that is used to insert an endotracheal tube into an individual, thereby establishing a more efficient airway than that which can be established with an ambu-bag
 
 
 [5]
 Nurse Slusher testified that she did not bring either the laryngoscope or endotracheal tubes with her, which, according to Dr. Greenberg, are pieces of equipment normally found in an intubation kit
 
 
 [6]
 The applicable limitations period is two years. See N.J.Stat.Ann. Sec. 2A:14-2 (West 1987)
 
 
 [7]
 According to Dr. Greenberg, these are all items that are typically included in an intubation kit
 
 
 [8]
 The Lundys presented the court with a report from an expert which stated, inter alia:
 (1) It is correct to say that intubation allowed for an improved exchange of oxygen that accounted for his improvement in color.
 (2) It is correct to say that, had the intubation equipment been available to the pulmonary physician who was doing CPR, Mr. Lundy's condition would have been better.
 (3) It is also correct that, to a reasonable degree of medical certainty, had Mr. Lundy been intubated sooner, there would have been a decreased likelihood of harm.
 The court found that even if it accepted the Lundys' expert's opinion as completely true, which it was required to do for the purposes of summary judgment, the expert in no way suggested that the standard of care that casino ownership must meet includes having an intubation kit on the premises. The expert opinion addressed only causation and not duty. App. 653-55.
 
 
 [9]
 We exercise appellate jurisdiction over this case pursuant to 28 U.S.C. Sec. 1291. The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. Sec. 1332 based on diversity of citizenship between the parties and an amount in controversy in excess of $50,000
 
 
 [10]
 Nurse Slusher's refusal to retrieve the intubation kit from her office does not constitute bad faith. Indeed, the record paints a picture of a good faith effort to revive Lundy and to maintain his respiration and pulse pending the arrival of the emergency medical technicians. The purpose of the Act is precisely to promote such commendable gratuitous undertakings as that exemplified by TropWorld. See Praet, 527 A.2d at 489 ("[T]he grant of legislative immunity to a volunteer was designed, simply and obviously, to encourage gratuitous assistance by those who have no legal obligation to render it."); id., 527 A.2d at 488 (" 'The purpose of [the Act] is to encourage the rendering of aid to injured persons at the scene of an accident or emergency without fear of civil liability.' ") (quoting legislative history of original bill)
 
 
 [11]
 At times, the Lundys appear to be arguing that TropWorld, by putting intubation equipment on its premises, voluntarily assumed a duty beyond its preexisting duty to take reasonable first aid measures and that TropWorld is, accordingly, liable for a breach of that voluntarily assumed duty. If the Lundys do so argue, we believe there are two answers. First, the Good Samaritan Act would protect TropWorld from liability arising from its voluntary activity. Second, a decision voluntarily to provide intubation equipment for the use of physician employees of an independent contractor who were known to be qualified to use it does not constitute a decision voluntarily to provide such equipment to strangers who volunteer assistance at the site of an emergency. These decisions involve distinctly different considerations, and we are confident that the Supreme Court of New Jersey would not regard them as equivalent
 
 
 [12]
 This case accordingly does not involve the issue of the circumstances under which the period for applying the second and third requirements may be longer than 120 days. Specifically, the Advisory Committee Notes following Rule 15 state that "this rule allows not only the 120 days specified in [Rule 4] but also any additional time resulting from any extension ordered by the court pursuant to that rule, as may be granted, for example, if the defendant is a fugitive from service of the summons." Here, the Lundys do not suggest that Dr. Carlino's knowledge was greater at some other potentially relevant point than it was during the 120 day period
 
 
 [13]
 The magistrate judge concluded that Dr. Carlino had reason to believe the Lundys, but for a mistake concerning the identity of the proper party, would have sued him. Accordingly, the magistrate judge granted the Lundys' motion to amend under Rule 15. This ruling was dispositive of Dr. Carlino's statute of limitations defense and the district court, accordingly, was free to rule de novo on the issue presented by this third requirement of Rule 15(c). Fed.R.Civ.P. 72(b). We review the district court's finding on that issue under a clearly erroneous standard. Varlack v. SWC Caribbean, Inc., 550 F.2d 171, 174 (3d Cir.1977). While the district court described the magistrate judge's conclusion as "clearly erroneous," it owed no deference to that conclusion. Nor do we. We do not disagree, however, with the district court's characterization of the magistrate judge's conclusion as being "clearly erroneous."
 
 
 [14]
 This case does not require us to decide whether Rule 15(c) applies in a situation where a proposed defendant should have known that, but for a mistake concerning the identity of the proper party, the plaintiff would have sued both the original defendant and the proposed defendant. We may assume that Rule 15(c) does cover such a situation. Dr. Carlino's only information, during the relevant period, concerning the Lundys' intent in filing their complaint was the information contained in that complaint. The Lundys there complained only about an alleged failure to provide emergency equipment and personnel and about an alleged failure to provide any "emergency medical treatment whatsoever." These allegations provide a basis for claims by the Lundys against TropWorld and possibly cross-claims by TropWorld against Dr. Carlino for breach of contract. However, the Lundys have suggested no legal theory under which these allegations could provide a basis for a claim by the Lundys against Dr. Carlino. If there be such a theory, it is sufficiently creative that we do not believe Dr. Carlino should be held to have anticipated it. As the district court stressed, there is no allegation in the Lundys' complaint that treatment of Mr. Lundy was undertaken by an employee of TropWorld who provided such treatment negligently. Accordingly, we are not faced with the issue of whether Dr. Carlino should have known that, but for a mistake concerning the identity of the employer of an employee alleged to be negligent in the complaint, the Lundys should have sued both TropWorld and Dr. Carlino
 
 
 [1]
 Lundy has not appealed the district court's rulings that Dr. Carlino and Dr. Carlino, P.A. were independent contractors and that this case does not fit into the exceptions New Jersey recognizes to nonliability for an independent contractor's conduct
 
 
 [2]
 The Rule now provides in pertinent part:
 Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when
 (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
 (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.
 FED.R.CIV.PROC. 15(c). The time period provided by Rule 4(m) is 120 days, subject to extensions for good cause shown. See FED.R.CIV.P. 4(m).
 
 
 [3]
 The Rule as it existed then provided that " '[a]n amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.' " Schiavone, 477 U.S. at 24 n. 5, 106 S.Ct. 2381 n. 5 (quoting FED.R.CIV.P. 15(c) (1990)) (emphasis supplied)
 
 
 [4]
 See, e.g., FED.R.CIV.P. 1 ("These rules ... shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." (emphasis supplied)); id. 8(f) ("All pleadings shall be so construed as to do substantial justice." (emphasis supplied)); id. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." (emphasis supplied))
 
 
 [5]
 See, e.g., Torres v. Oakland Scavenger Co., 487 U.S. 312, 316, 108 S.Ct. 2405, 2408, 101 L.Ed.2d 285 (1988) ("[T]he requirements of the rules of procedure should be liberally construed and ... 'mere technicalities' should not stand in the way of consideration of a case on its merits[.] "); Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 373, 86 S.Ct. 845, 851, 15 L.Ed.2d 807 (1966) ("If rules of procedure work as they should in an honest and fair judicial system, they not only permit, but should as nearly as possible guarantee that bona fide complaints be carried to an adjudication on the merits."); Foman v. Davis, 371 U.S. 178, 181, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of ... mere technicalities."); Conley v. Gibson, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) ("The Federal Rules [of Civil Procedure] reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."); Maty v. Grasselli Chem. Co., 303 U.S. 197, 200, 58 S.Ct. 507, 509, 82 L.Ed. 745 (1938) ("Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should notse barriers which prevent the achievement of that end."); see also 2A JAMES WM. MOORE & JO D. LUCAS, MOORE'S FEDERAL PRACTICE p 8.02, at 8-10 (2d ed. 1994) ("The real importance of the pleading rules is that they make pleadings, in and of themselves, relatively unimportant. Cases are to be decided on the merits."); 2 id. p 1.13, at 1-59 ("[Rule 1] sets a theme of liberality in the application of the procedural rules and fosters the principle that the outcome of cases should turn on their merits rather than on technical issues of pleading and procedure."); 3 id. Sec. 15.15, at 15-146 ("The general philosophy of the pleading rules is that they should give fair notice, should be liberally construed, be subject to liberal amendment, and that decisions should be on the merits and not on technical niceties of pleading." (footnotes omitted)); 5 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE Sec. 1286, at 558-59 (2d ed. 1990) ("[A]n inadvertent mistake in a pleading will not be held against the pleader if another party has not been misled by the mistake or otherwise prejudiced."); 4 id. Sec. 1029, at 118 ("The federal rules are designed to discourage battles over mere form and to sweep away needless procedural controversies that either delay a trial on the merits or deny a party his day in court because of technical deficiencies.")
 
 
 [6]
 Specifically, the Supreme Court's order states that the amendments to the Federal Rules of Civil Procedure "shall take effect on December 1, 1991, and shall govern all proceedings in civil actions thereafter commenced and, insofar as just and practicable, all proceedings in civil actions then pending." Order Re: Amendments to Federal Rules of Civil Procedure, 111 S.Ct. Preface 813 (April 30, 1991) (emphasis supplied). Congress delegated to the Supreme Court the authority to make changes in the Rules retrospective:
 [Proposed rules of the Supreme Court] shall take effect no earlier than December 1 of the year in which such rule is [transmitted to Congress] unless otherwise provided by law. The Supreme Court may fix the extent such rule shall apply to proceedings then pending, except that the Supreme Court shall not require the application of such rule to further proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.
 20 U.S.C.A. Sec. 2074(a) (Supp.1993).
 
 
 [7]
 Only two courts of appeals' decisions have declined to apply the amendment to Rule 15(c) retrospectively, Diaz v. Shallbetter, 984 F.2d 850, 853 (7th Cir.1993) and Freund v. Fleetwood Enterprises, Inc., 956 F.2d 354, 363 (1st Cir.1992). But in Woods, a different panel of the Seventh Circuit determined to give effect to the Supreme Court's directive to apply the amended Rule to all pending cases "insofar as just and practicable" by essentially confining Diaz to cases in which the district court had dismissed the entire complaint prior to the effective date of the amendment. The court of appeals held that Rule 15(c) would apply retrospectively to all cases pending in the district courts on December 1, 1991. 996 F.2d at 885-86
 Freund was decided as it was by virtue of its odd assortment of facts, in light of which retrospective operation would have worked a "manifest injustice." The court of appeals emphasized that (1) the plaintiff had lost a full jury trial involving almost the same issues against some other defendants and there was no reason to think a second trial's outcome would differ; and (2) it would likely have concluded its appellate review before the amendment took effect on December 1, 1991 had the plaintiff presented his "weak" arguments on appeal "in a more forthright manner." 956 F.2d at 363.
 The common thread coursing through both Diaz and Freund is the fact that proceedings in the district court had terminated prior to the effective date of the amendment. Since this special circumstance is missing here, even assuming Diaz and Freund are persuasive, they are inapposite.
 
 
 [8]
 Cf. Bechtel, 886 F.2d at 652 (holding that to show prejudice the party opposing the amendment of a complaint "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the ... amendments been timely" (internal quotation omitted) (emphasis supplied)), quoted in Dole v. Arco Chem. Co., 921 F.2d 484, 488 (3d Cir.1990); Evans Prods. Co. v. West Am. Ins. Co., 736 F.2d 920, 923 (3d Cir.1984) ("The principal test for prejudice ... is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence...." (citations omitted)); Deakyne v. Commissioners of Lewes, 416 F.2d 290, 300 n. 19 (3d Cir.1969) ("Prejudice under [Rule 15] means undue difficulty in prosecuting a lawsuit as a result of a change of tactics or theories on the part of the other party."); see also 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE Sec. 1498, at 126 ("[C]ourt[s] should not give special treatment to the careless or myopic added defendant whose alleged prejudice results from his own superficial investigatory practices or poor preparation of a defense. But at least when the facts relevant to one possible claimant do require a substantially different and more burdensome investigatory effort or when the initial action is not sufficiently serious to warrant a full-fledged investigation, a party should be able to rely on the statute of limitations when that claimant does not interpose his claim in time.")
 
 
 [9]
 Substantial support for the magistrate judge's conclusion that the Carlinos were not prejudiced exists on both factual and legal grounds: there is not a great difference, if any, between Trop World's third party cross-claims and Lundy's negligence claims. The amounts at stake are identical because Trop World sought full indemnification. See App. 22a, 23a (Third Party Complaint, First Count p 2; id., Third Count, p 2). Moreover, the legal issues the Carlinos needed to research and the facts they needed to investigate were substantially the same because Trop World sought contribution from the Carlinos as a joint tortfeasor pursuant to the New Jersey Joint Tortfeasors Contribution Act, 2A N.J.STAT.ANN. Sec. 53A-3 (1993), see App. 22a (Third Party Complaint, Second Count p 2), and because the Carlinos asserted a cross-claim predicated on the New Jersey Comparative Negligence Act, 2A N.J.STAT.ANN. Sec. 15-5.1 (1993), see App. 43a-44a (Answer to Third Party Complaint at 4-5). Both Trop World's contribution claim and the Carlinos' comparative negligence cross-claim required the Carlinos to address the substance of Lundy's complaint and to discover the facts underlying it
 There is also ample support for the magistrate judge's conclusion that the Carlinos had actually engaged in the preparation of a defense in the action that did not differ substantially from what their defense would have been had Lundy originally named them as defendants. Most importantly, the Carlinos' counsel attended all the depositions taken by the original parties. See App. 140a-41a (Nurse Slusher); App. 173a-74a (Maryann Strang); App. 201a-03a (Dr. Greenberg); App. 233a-35a (Mrs. Greenberg); App. 246a-47a (Verna Ayo).
 
 
 [10]
 Of particular relevance to prejudice in a case such as this are the goals sought to be protected by statutes of limitations. See FED.R.CIV.P. 15(c), advisory committee's notes--1966 amendment ("Relation back is intimately connected with the policy of the statute of limitations."). On this note the Supreme Court has informed us that
 [s]tatutes of limitations are primarily designed to assure fairness to defendants. Such statutes "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." Order of R.R. Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348-49, 64 S.Ct. 582, 586 [88 L.Ed. 788] (1944). Moreover, the courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights.
 Burnett v. New York Cent. R.R. Co., 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965); see National Iranian Oil Co. v. Mapco Int'l, Inc., 983 F.2d 485, 493 (3d Cir.1992). Since the exact same evidence, memories, and witnesses are pertinent to Lundy's original Complaint and Trop World's Third Party Complaint as would be pertinent to Lundy's Amended Complaint against the Carlinos, and since the district court was burdened with the claim and cross-claim already, none of the interests sought to be protected by the applicable statute of limitations would be abridged were Lundy allowed to amend his complaint to name the Carlinos as defendants.
 
 
 [11]
 These paragraphs allege:
 
 
 [2]
 At all times material hereto, Defendant acted, and failed to act, by and through its agents, servants, work persons and employees in the course and scope of employment
 
 
 [4]
 At all times material hereto, Defendant, as the owner in possession of a hotel, restaurant and gambling complex open to the public, was under a duty to its business invitees to have proper first aid facilities and personnel available to its business invitees and was also under a duty to its business invitees to take reasonable action to render first aid to such business invitees, when necessary
 
 
 [5]
 At all time[s] material hereto, Defendant knew, and had reason to know, that Plaintiff had suffered a cardiac arrest and required first aid, oxygen and other medical attention
 
 
 [6]
 Defendant negligently, recklessly and carelessly failed to perform its duty to Plaintiff by failing to have such emergency-first aid facilities, oxygen or medical personnel available
 
 
 [7]
 Although Defendant telephoned for an ambulance to take Plaintiff to the hospital, it otherwise rendered no first aid or emergency medical treatment whatsoever to Plaintiff, despite his crucial need for same
 
 
 [8]
 Due to all the foregoing, Defendant increased the likelihood of harm to the Plaintiff
 App. 10a-11a (Complaint).
 
 
 [12]
 While the district court did describe the magistrate judge's conclusion that Rule 15(c)(3) had been satisfied as being "clearly erroneous," see Maj.Op. at 1183 n. 13; Mem.Op. at 25, the context of the sentence leaves no doubt that the court was referring to the magistrate judge's conclusions of law, not his factual findings. The majority does not indicate otherwise. See Maj.Op. at 1177 ("Because the district court's decision regarding Rule 15(c) was based on the court's interpretation of the Federal Rules of Civil Procedure, we exercise plenary review of this decision...."). I am puzzled, then, by the majority's assertion that it owes "no deference" to the magistrate judge's findings of fact. See Maj.Op. at 1183 n. 13. Insofar as the district court adopted (that is, did not disapprove of) the magistrate judge's findings of fact, we review them for clear error. That is, while the district court may review the magistrate judge's findings of fact de novo under Federal Rule of Civil Procedure 72(b), an appellate court may not, for the obvious reason that we are reviewing the district court's, not the magistrate judge's, findings of fact, and such review is governed by the clearly erroneous standard
 
 
 [13]
 See Garvey, 993 F.2d at 778 n. 6, 783 n. 17 (allowing plaintiff to amend his complaint to add the United States as a defendant under the Federal Tort Claims Act where plaintiff had initially sued individual federal officials under a Bivens theory); Fromson v. Citiplate, Inc., 886 F.2d 1300, 1303-04 (Fed.Cir.1989) (allowing the plaintiff to relate back the amendment of his complaint to add the two owners of a corporation which already was a defendant as defendants); Berndt, 796 F.2d at 883-84 (allowing the plaintiff to substitute state officials for the state and a state agency in a Sec. 1983 case); Itel Capital Corp. v. Cups Coal Co., 707 F.2d 1253, 1258 & n. 9 (11th Cir.1983) (allowing the plaintiff to relate back the amendment of his complaint to add a new defendant after the limitations period had expired: "we read the word 'mistake' in Rule 15(c) liberally."); Heinly v. Queen, 146 F.R.D. 102, 107 (E.D.Pa.1993) ("The 'mistake condition' in [the] third element is not limited to cases of misnamed or misdescribed parties, rather the Rule is widely-understood to allow the addition of new parties that were never originally named or described." (citing Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc., 801 F.Supp. 1450, 1457 (E.D.Pa.1992)); Smith v. TW Servs., Inc., 142 F.R.D. 144, 149-50 (M.D.Tenn.1991) (allowing plaintiff to add a separate defendant not named in the initial complaint); Swartz, 91 F.R.D. at 547 (holding that a "new defendant should have known that but for a mistake concerning identity the action would have been brought against him ... 'whenever a party who may be liable for the actionable conduct alleged in the Complaint was omitted as a party defendant.' " (quoting Williams v. Avis Transp. of Can., Ltd., 57 F.R.D. 53, 55 (D.Nev.1972))); 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE Sec. 1498, at 126-29 ("The word 'changing' [in Rule 15(c) ] has been liberally construed by the courts, so that amendments simply adding or dropping parties, as well as amendments that actually substitute defendants, fall within the ambit of the rule.... [T]here is no justification for a restrictive interpretation of the word 'changing' that would require a plaintiff to choose among defendants." (emphasis supplied)); cf. Loudenslager v. Teeple, 466 F.2d 249, 250-51 (3d Cir.1972) (allowing the plaintiff to amend his complaint to substitute the personal representative of the decedent's estate for the decedent); see also 6A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE Sec. 1498, at 103-04 (stating that Rule 15(c) "alters the general rule that new parties ... cannot be added to an action by amendment after the applicable limitations period has expired" (emphasis supplied)), cited with approval in Bloomfield Mech. Contracting, Inc. v. Occupational Safety & Health Review Comm'n, 519 F.2d 1257, 1262 (3d Cir.1975); Dandrea v. Malsbary Mfg. Co., 839 F.2d 163, 166 (3d Cir.1988) (deciding whether plaintiff's amendment changed the party or merely updated the party's name); Mitchell v. Hendricks, 68 F.R.D. 564 (E.D.Pa.1975) (allowing plaintiff's amendment of his complaint to relate back where plaintiff mistakenly named the wrong person as the defendant and the newly named defendant had received informal notice of plaintiff's initial complaint). But cf. Worthington v. Wilson, 8 F.3d 1253, 1256-57 (7th Cir.1993) (reading Rule 15(c) to exclude naming a different party "due to a lack of knowledge as to their identity" rather than as to their correct name); Campbell v. Ward, 792 F.Supp. 1150, 1153 (E.D.Mo.1992) (same); Wells v. HBO & Co., 813 F.Supp. 1561, 1567 (N.D.Ga.1992) (denying plaintiff's motion to amend complaint where plaintiff had deliberately not sued a party whose identity plaintiff had known from the outset)
 The many other courts to have recognized the "identity of interest" exception to Rule 15(c) have also necessarily held that Rule 15(c) allows for the addition of a party, rather than only for the correction of a party's name. See, e.g., In re Allbrand Appliance & Television Co., 875 F.2d 1021, 1025 (2d Cir.1989). See generally WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE Sec. 1459.
 
 
 [14]
 Federal pleading rules rely only on "notice pleading." See FED.R.CIV.P. 8(a)(2) (a complaint shall set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" (emphasis supplied)). The Supreme Court rehearsed the proper role of pleadings in Conley v. Gibson, 355 U.S. 41, 47-48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957):
 [T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is "a short and plain statement of the claim" [, FED.R.CIV.P. 8(a)(2),] that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.... Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues.... The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.
 Id. (citation substituted for footnote); see Universe Tankships, Inc. v. United States, 528 F.2d 73, 75 (3d Cir.1975) (notice pleading requires a party only to "disclose adequate information as the basis of his claim for relief" (internal quotation omitted)); see also, e.g., Quinones v. United States, 492 F.2d 1269, 1273 (3d Cir.1974) (" 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' " (quoting Conley, 355 U.S. at 45-46, 78 S.Ct. at 102)).
 The Appendix of Forms to the Federal Rules of Civil Procedure, Form 9, is illustrative of the bare-bones allegations recommended by the Rules in a negligence action. That form calls for an "[a]llegation of jurisdiction," a brief description of the underlying event, a brief description of plaintiff's injuries, and a prayer for relief. For this reason I remonstrate that the majority in effect relies on the fact that Lundy complied with the lax standards established by the Rules, rules designed to prevent errors in pleading technicalities from displacing resolutions on the merits, to argue that the plaintiff did not provide adequate notice. To the contrary, I find these lax standards important because the Carlinos should have known that under the federal rules Lundy was not bound by the exact allegations or the precise theories encapsulated in his Complaint, and thus they could not have reasonably relied on other theories of liability, additional facts, or additional parties not being added later. In sum, the philosophy of federal notice pleading is an essential backdrop when adjudging what a potential defendant "should have known," and what the Carlinos "should have known" when they were served with a copy of Lundy's complaint even though no employee of theirs was specifically named therein.
 
 
 [15]
 There is no denying that Lundy was sluggish amending his complaint. The record shows that on September 12, 1991, Trop World filed its Third Party Complaint against the Carlinos. See App. 21a-39a. A cursory reading of the attached Contract for Medical Services, particularly in light of the common knowledge that medical doctors are often independent contractors, would have revealed to a reasonable attorney that the Carlinos were independent contractors who were responsible for providing nursing services at Trop World during the time that Nurse Slusher provided medical assistance to Lundy. See App. 29a, 34a (Contract for Medical Services at 2, 7). Moreover, on both December 26 and December 31, 1991, the Carlinos' counsel informed Lundy's counsel that Nurse Slusher no longer worked for the Carlinos. App. 455a (Letter of 12/26/91); id. 456a (Letter of 12/31/91). Finally, Lundy deposed Nurse Slusher and the Greenbergs in mid March, 1992. Nevertheless, Lundy did not seek to amend his complaint to add the Carlinos as defendants until May 28, 1992, about eight months after Lundy should have known that the Carlinos were independent contractors, about five months after he should have known that the Carlinos employed Nurse Slusher, and over two months after he had actual knowledge of Nurse Slusher's employment situation
 At oral argument Lundy tried to explain away the delay by reference to his fear of Rule 11 sanctions. See FED.R.CIV.P. 11 (authorizing sanctions against parties asserting groundless claims). But that does not illuminate the reason for the two-month delay after Lundy had deposed his final fact witness. Moreover, that answer does not explain why there was any more reason to fear Rule 11 sanctions for naming the Carlinos, already parties to the litigation, as defendants as opposed to naming Trop World as a defendant when he initiated his suit.
 
 
 [16]
 See Keller v. Prince George's County, 923 F.2d 30, 34 (4th Cir.1991) (reasoning that because plaintiff did not file a complaint against the defendants before the running of the limitations period, although she was aware of their identity and involvement from the day the underlying events occurred, they had no reason to suspect that but for a mistake as to their identity she would have originally named them); Kilkenny v. Arco Marine Inc., 800 F.2d 853, 856-57 (9th Cir.1986) (refusing to allow plaintiff to name the original defendant's subsidiaries as defendants in an untimely amendment because the subsidiaries had no reason to know plaintiff was mistaken about their identity: the plaintiff had been informed by the original defendant two years before the statute of limitations ran that the subsidiaries were probably the proper defendants and the plaintiff had sued the subsidiaries in another forum, which suit was dismissed after 14 months (nine months before the running of the statute of limitations) for lack of prosecution), cert. denied, 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987)
 
 
 [17]
 Anderson held that the district court improperly refused to allow plaintiffs to relate back their amendment of their complaint to name the parent of the original defendants as a defendant. The plaintiffs had learned of the parent's identity only after the limitations period had expired, but then they failed to seek to amend their complaint for nine months and waited an additional two months to serve the new defendant
 
 
 [18]
 See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (holding that absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the amendment, futility of the amendment, etc.," leave to amend should be freely given (emphasis supplied)); Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir.1993) ("In the absence of substantial or undue prejudice, denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." (emphasis supplied)) (affirming district court's denial of an amendment sought three years after initiation of the action, at which time plaintiff already knew most of the relevant facts, and two years after her second amendment of the complaint, at which time she probably knew all the facts); see also 3 JAMES WM. MOORE & RICHARD D. FREER, MOORE'S FEDERAL PRACTICE p 15.08, at 15-49 (2d ed. 1993) (stating that leave to amend should not be granted if the moving party has acted for the purpose of delay, the opposing party will be unduly prejudiced, or the trial of the issues will be unduly delayed); id. p 15.08, at 15-69 to -75 ("The most common reasons for denying leave to amend are that the amendment will result in undue prejudice to the other party, is unduly delayed, is offered in bad faith or for dilatory purposes, or that the party has had sufficient opportunity to state a claim but has failed" (emphasis supplied, footnotes omitted))
 
 
 [19]
 See Cornell & Co., Inc. v. Occupational Safety & Health Comm'n, 573 F.2d 820, 823 (3d Cir.1978) ("Delay alone ... is an insufficient ground to deny an amendment, unless the delay unduly prejudices the non-moving party."); Adams, 739 F.2d at 868 ("The passage of time, without more, does not require that a motion to amend a complaint be denied; however, at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party."); Deakyne v. Commissioners of Lewes, 416 F.2d 290, 300 n. 19 (3d Cir.1969) ("We do not believe delay alone is a sufficient measure of prejudice[;] the element of delay is pertinent only to the extent that it combines with some extrinsic occurrence which brings about actual and significant prejudice to the opponent." (internal quotation omitted)); see also 3 JAMES WM. MOORE & JO D. LUCAS, MOORE'S FEDERAL PRACTICE p 15.08, at 15-76 (2d ed. 1994) ("It should be emphasized, however, that while laches and unexcused delay may bar a proposed amendment, delay alone, regardless of its length, is not enough to bar it if the other party is not prejudiced.")
 
 
 [20]
 See Boileau v. Bethlehem Steel Corp., 730 F.2d 929, 939 (3d Cir.1984) ("[T]he delay exception in amending the complaint refers to delay in the actual proceeding in which the complaint occurs, not delay in bringing suit."), cert. denied, 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 150 (1984); Adams, 739 F.2d at 868-69 (stating that "undue delay" refers to placing "an unwarranted burden on the court" and holding that plaintiff's delay in amending the complaint to add a new legal theory until after defendant was granted summary judgment by this Court on an interlocutory appeal did not constitute "undue delay")
 
 
 [21]
 I agree with the majority's reading of New Jersey law concerning relation back of pleading amendments, see Maj.Op. at 1183-84; see Lawlor v. Cloverleaf Memorial Park, Inc., 56 N.J. 326, 266 A.2d 569, 576-79 (1970); Greco v. Valley Fair Enters., 105 N.J.Super. 582, 253 A.2d 814, 815-16 (App.Div.1969); De Sisto v. City of Linden, 80 N.J.Super. 398, 193 A.2d 870, 874-75 (Law Div.1963), and thus concur that Lundy has not brought himself within Rule 15(c)(1)
 
 
 [22]
 I note that Lundy has not proffered any evidence that Trop World advertised the availability of medical services on the premises and that he patronized Trop World on that basis. Thus the majority does not consider to what extent, if any, these factors would influence the analysis of Trop World's duties or the application of New Jersey's Good Samaritan Act. On a similar note, Lundy has also not claimed he was an intended third party beneficiary of the contract formed between Trop World and the Carlinos, and so that issue is not before this Court either
 
 
 [23]
 In Adamowicz v. Claridge at Park Place, Inc., 522 N.Y.S.2d 884, 135 A.D.2d 769 (1987), the New York Supreme Court, Appellate Division, purported to apply New Jersey law when it held in a case much like this one that a casino/hotel owed "no duty, either at common law or by statute, rule, or code, ... to render aid to a sick patron." 522 N.Y.S.2d at 885. The court, however, did not bother to cite a single New Jersey statute or case, or, for that matter, any sister state's law or other legal authority in support of its conclusion. Such "authority" is singularly unpersuasive
 
 
 [24]
 Cf. Moody v. Security Pac. Business Credit, Inc., 971 F.2d 1056, 1063 (3d Cir.1992) ("[w]here Pennsylvania law is silent, we may look to the law in other jurisdictions"); Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., 652 F.2d 1165, 1167 (3d Cir.1981) (we may consider "[t]he policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts," and may additionally "consult treatises, the Restatement, and the works of scholarly commentators"); McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, 663 (3d Cir.1980) ("In sum, a federal court attempting to forecast state law must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data."), cert. denied, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980)
 
 
 [25]
 Section 314A has met with astounding success: the great majority of the cases mentioned in this section handed down after 1965 adopt it or cite it with approval. Incidentally, the lone published New Jersey case to reference Sec. 314A, albeit tangentially, did so approvingly. See McIntosh v. Milano, 168 N.J.Super. 466, 403 A.2d 500, 509 (Law Div.1979)
 
 
 [26]
 Comment f to Sec. 314A of the Restatement provides:
 The defendant ... is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained.
 REST.2D (TORTS) Sec. 314A cmt. f (emphasis supplied); see id. illus. 1, 5, 7.
 
 
 [27]
 An early landmark decision departing from the traditional hesitation by courts to impose an affirmative legal duty to act was handed down by the Minnesota Supreme Court in the celebrated case of Depue v. Flateau, 100 Minn. 299, 111 N.W. 1, 3 (1907) (holding that the defendant, who was visited by a business-invitee who took ill during his visit, owed the invitee a duty to take reasonable steps to assure the plaintiff's well-being if the defendant appreciated plaintiff's condition; to satisfy his duty, the defendant need not necessarily have entertained the plaintiff through the night--although if reasonable under the circumstances he should have--but had only to do what was reasonably possible given the situation, such as contacting his neighbors or summoning care). Courts have in the time since imposed other reasonable obligations besides summoning aid on businesses. See, e.g., Estate of Starling v. Fisherman's Pier, Inc., 401 So.2d 1136, 1138 (Fla.Dist.Ct.App.1981) (holding in a case where a proprietor had knowingly left an inebriated man lying alone and unconscious on a pier near the water that a proprietor has a duty to safeguard a customer upon its premises whom it knows is exposed to extreme hazards, even if the customer brought the hazard upon himself; the customer had fallen into the ocean and drowned), petition denied, 411 So.2d 381 (Fla.1981); Lloyd v. S.S. Kresge Co., 85 Wis.2d 296, 270 N.W.2d 423, 426 (Ct.App.1978) (holding that a business which, although it was freezing cold outside, refused to let a customer it knew or should have known to be ill remain in the store for ten minutes after closing while she waited for her ride, could be liable for negligence because it had to take reasonable steps to shelter a customer); L.S. Ayres & Co. v. Hicks, 220 Ind. 86, 40 N.E.2d 334, 336-38 (1942) (holding that, while a business must not attend a dangerous instrumentality on its premises, a business must must act reasonably once alerted to the danger of an ongoing injury to an invitee if the aggravation of the injury is caused by the business' instrumentality, although the fact of the injury cannot be attributed to any negligence on its part; a child had fallen and caught his fingers between the steps and comb on the floor at the base of an escalator); Connelly v. Kaufmann & Baer Co., 349 Pa. 261, 37 A.2d 125, 127 (1944) (same)
 Faced with scenarios evoking the duty actually to provide medical care, courts have consistently imposed on a business a standard of care satisfied by reasonable steps to summon medical aid and take other reasonable action to ameliorate the injury, but no more. See, e.g., Applebaum v. Nemon, 678 S.W.2d 533, 535-37 (Tex.Ct.App.1984) (holding that the daycare-child relationship imposed upon the daycare a common law duty "to render reasonable assistance to a child in its custody who becomes imperiled" and that "[i]n most circumstances the defendant will not be required to do more than administer whatever initial aid he reasonably can and knows how to do, and take reasonable steps to place the injured person in the hands of a competent physician" (emphasis supplied); the daycare center was not obligated to have present medically trained employees who could administer CPR, a relatively simple first aid technique to learn and administer, or other medical assistance in times of emergency, and it had no duty to train its employees to deal with a medical emergency effectively); see also Baca v. Baca, 81 N.M. 734, 472 P.2d 997, 1001-02 (Ct.App.1970) (holding that a bar which had turned a customer injured in a bar room brawl over to the police's custody as a drunk without troubling to inform them of his serious injuries may have breached its "duty to take reasonable care of him"). A common contemporary occurrence in which courts have directly addressed whether a business is required to provide minimal first aid--typically the Heimlich Maneuver--or whether its duty is satisfied simply by taking reasonable steps such as promptly calling for emergency help is in restaurant choking cases. Although, like CPR, the Heimlich Maneuver is a relatively simple yet astonishingly successful emergency technique, influenced by the infrequency of fatal chokings and the rapid employee turnover common to restaurant work, the clear majority rule is that there is no duty to provide emergency treatment. See Drew v. LeJay's Sportsmen's Cafe, Inc., 806 P.2d 301, 305-06 (Wyo.1991); Coccarello v. Round Table of Coral Gables, Inc., 421 So.2d 194, 195 (Fla.Dist.Ct.App.1982) (per curiam); Parra v. Tarasco, Inc., 230 Ill.App.3d 819, 172 Ill.Dec. 516, 518, 522-23, 595 N.E.2d 1186, 1188, 1192-93 (1992) (relying on a statute shielding restaurants from liability for failing to so aid choking patrons); Breaux v. Gino's, Inc., 153 Cal.App.3d 379, 200 Cal.Rptr. 260, 261-62 (1984) (same); Acosta v. Fuentes, 150 Misc.2d 1013, 571 N.Y.S.2d 666, 667-68 (N.Y.Sup.Ct.1991) (same). But see City Nat'l Bank v. 4000 Restaurant, Inc., 372 So.2d 1146, 1147 (Fla.Dist.Ct.App.1979) (Anstead, J., dissenting).
 Equally instructive are cases that have found no breach of a duty on the part of a business toward its invitees. See Traudt v. City of Chicago, 98 Ill.App.2d 417, 240 N.E.2d 188, 191 (1968) (holding that an airport had no duty to maintain "safety appurtenances and appliances" which it could employ to save drowning pilots, although it was foreseeable if not highly probable that, given the airport's location, some plane would crash into the surrounding lake); Harold's Club v. Sanchez, 70 Nev. 518, 275 P.2d 384, 386-87 (1954) (holding that a casino had no duty to commit a "privileged battery" to prevent an inebriated patron from riding upon an escalator, even if an injury appeared to be likely); Dumka v. Quaderer, 151 Mich.App. 68, 390 N.W.2d 200, 203-04 & n. 2 (1986) (holding that a business had no duty to aid or assist a customer who entered the premises in an inebriated condition and that the business violated no duty when it ordered the customer to leave, accompanied by his friends, and when it took no steps to assist him when it later learned that his friends had returned to the establishment, leaving him exposed to danger), appeal denied, 426 Mich. 861 (1986).
 
 
 [28]
 I do not believe that the New Jersey Supreme Court would hold that Trop World had a duty to maintain emergency medical equipment, such as an intubation kit, on its premises in the first instance. My conclusion that there is a jury question in this case derives solely from the observation that Trop World did, in fact, have an intubation kit on the premises, and hence the only question is whether it would have been reasonable under the circumstances for Nurse Slusher to bring it to Dr. Greenberg, who had manifested his capacity to use it, once he requested it. This does not punish Trop World for maintaining such equipment on its premises, but merely implements the general negligence doctrine that one must act reasonably under the circumstances; the coincidental presence nearby of a lifesaving device is simply one of the relevant circumstances a jury may consider
 
 
 [29]
 Even though the majority mentions Dr. Greenberg's testimony that it took about twenty minutes for the ambulance to arrive, see Maj.Op. at 1175-76, I in no way suggest that a seventeen minute delay (twenty minutes less the three minutes from the time it was summoned it took the ambulance to arrive) before summoning medical care would be reasonably prompt under the circumstances: that issue is simply not before us
 
 
 *
 Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation